2006-NMSC-042

143 P.3d 478

In the Matter of the Investigation of Whether Qwest Corporation is in Compliance with the Investment Requirements of its Amended Alternative Form of Regulation Plan,

QWEST CORPORATION, Appellant,

v.

NEW MEXICO PUBLIC REGULATION COMMISSION, Appellee,

and

General Services Department of the State of New Mexico, Intervenor.

No. 29,228.

Supreme Court of New Mexico.

June 29, 2006.

Rehearing Denied Sept. 19, 2006.

As Revised Sept. 25, 2006.

Montgomery & Andrews, P.A., Thomas W. Olson, Sarah M. Singleton, Santa Fe, NM, Hogan & Hartson, L.L.P., Peter A. Rohrbach, H. Christopher Bartolomucci, Washington, D.C., for Appellant.

Margaret Caffey–Moquin, Santa Fe, NM, for Appellee.

Merrill, Arnone & Jones, L.L.P., Richard H. Levin, Santa Rosa, CA, for Intervenor.

## OPINION

SERNA, Justice.

{1} The Public Regulation Commission (the PRC) regulates all telecommunication carriers in New Mexico. Pursuant to this authority, the PRC approved a five-year alternative form of regulation (AFOR) plan for Qwest Corporation, one such carrier. Qwest, PRC staff and other parties actively negotiated and endorsed the AFOR plan. During the plan's third year, the PRC investigated whether Qwest was in compliance with a key component of the AFOR plan: a commitment by Qwest to invest $788 million in its New Mexico telecommunications infrastructure. The PRC found Qwest was not in compliance and ordered Qwest to issue credits or refunds to customers in an amount equal to any shortfall at the end of the five-year plan. Qwest now appeals this order. Qwest argues that the credit or refund order is outside the PRC's statutory authority, is an improper form of retroactive remedy, is motivated by improper objectives, and is premature and

speculative. The PRC avers that it had the statutory authority to approve Qwest's AFOR plan; the $788 million investment provision was a key compromise in the AFOR plan; Qwest failed to timely object to the investment provision at the time the plan was negotiated and approved, thereby waiving the ability to challenge it later; the Legislature has given the PRC broad authority to enforce its orders; and the credit or refund order is merely an incentive for Qwest to complete its investment commitment before the end of the five-year term.

{2} We agree with the PRC that it had the statutory authority to enter into the AFOR plan and add the credit or refund incentive for Qwest to invest the full $788 million in its telecommunications infrastructure. The credit or refund order is not an impermissible retroactive remedy, was not based on an impermissible purpose, nor was it premature or speculative.

{3} Qwest also argues that the PRC's order should be set aside because of procedural errors and errors in the PRC's compliance investigation findings. Because we find no error, we affirm.

## I. FACTS

### A. Utility Case No. 04–00237–UT: Qwest's Amended AFOR Plan and the AFOR Order

{4} On March 7, 2000, the Governor of New Mexico signed the Legislature's amendments to the New Mexico Telecommunications Act, NMSA 1978, §§ 63–9A–1 to –20 (1985, as amended through 2004). One of the purposes of these amendments was to eliminate rate of return regulation[1] and implement an alternative form of regulation for incumbent telecommunications carriers with more than fifty thousand access lines, such as Qwest. See § 63–9A–8.2(C) (2001).

{5} In January 2001, pursuant to the Act, PRC staff, Qwest Corporation, and other parties agreed to an AFOR plan to regulate Qwest for a period of five years from 2001–2006.[2] The plan included a commitment by Qwest to invest a total of $788 million over the five-year term, approximately $157.6 million per year, in its New Mexico infrastructure. This was approximately a 25 percent increase over Qwest's 1995–1999 investment. Qwest committed to a separate provision that required it to meet yearly quality of service standards, or potentially issue substantial credits to customers if these service standards were not met. The AFOR plan resolved and lead to the dismissal of eight pending PRC cases concerning Qwest[3]: Utility Case Nos. 3007, 3008, 2938, 2939, 3162, 2922, 3147, and 3429. As an incentive, if Qwest met its investment commitments and service standards during the first two years of the plan, then Qwest would be able to increase its price caps[4] for residence basic exchange service, or 1FR.

{6} At hearings, Qwest executives acknowledged the inherent risks in the AFOR plan investment commitment and the distinctiveness of this commitment from the service standards. Charles Ward, then Qwest's Regional Vice President for the Eastern Region, testified,

> [t]he total $788 million in infrastructure investments over the five-year term of the Plan severely limits Qwest's options to respond to the changing industry environment. If ... the investment package for

---

1. Historically the telecommunications industry was monopolistic and required unique regulation. As a result, under rate of return regulation, the PRC sought to set rates that were neither unreasonably high so as to unjustly burden ratepayers nor unreasonably low so as to prevent a carrier from earning a reasonable rate of return on its investment. *PNM Gas Servs. v. Pub. Util. Comm'n*, 2000–NMSC–012, ¶ 8, 129 N.M. 1, 1 P.3d 383. The PRC also held hearings whenever a carrier sought to increase its rates, with the burden on the carrier to show the new rate was just and reasonable. Section 63–9A–8.1 (1998).

2. The AFOR plan commenced July 1, 2001, and terminated on March 8, 2006. The terms were measured in twelve-month periods commencing on July 1, except for year five which ended on March 8, 2006.

3. On June 30, 2000, Qwest merged with U.S. WEST, Inc. Some of these pending cases involved U.S. WEST.

4. The AFOR plan initially set Qwest's prices to $10.66 for residence basic exchange service, and $34.37 for business basic exchange service, or 1FB.

New Mexico does not realize gains, or if competition increases the company's exposure to cover its costs of investment, Qwest will be unable to change the amount invested in the state. . . .

The AFOR Plan puts Qwest at risk even beyond the $788 million commitment, because the Plan imposes rigorous service quality requirements.

A different Qwest executive testified to the background and status of the pending PRC cases and how the AFOR plan would resolve each one. As a result of the hearings and negotiations among all parties, the PRC issued a final order approving an amended version of Qwest's suggested AFOR plan, described in an amended joint stipulation, on March 8, 2001.

{7} In the AFOR order, the PRC noted that considerable time at the hearings was devoted to the amended AFOR plan reopener provisions, including section X.B.5.e, which "allows the [PRC] to modify the AFOR to ensure compliance with the AFOR's service standards or investment commitments if the [PRC] finds that the benefits and credits provided in the plan do not provide sufficient incentives." While the parties generally agreed that the PRC should retain the ability to reexamine any aspect of the AFOR plan during its five-year term, the PRC order cited the statutory and legal authority for this post-approval ability. The PRC noted the broad statutory authority given to it by the Legislature to determine any issues within its regulatory authority, see NMSA 1978, § 63–7–1.1 (1998), to conduct investigations to carry out its responsibilities, see NMSA 1978, § 8–8–4(B)(7) (1998), and to enforce its orders "by appropriate administrative action and court proceedings," Section 8–8–4(B)(5).

{8} After actively negotiating in favor of the AFOR plan terms, Qwest did not appeal the amended AFOR plan, the amended joint stipulation, nor the PRC's final order. See § 63–9A–14 (permitting aggrieved parties to appeal PRC final orders).

**B. The PRC's Investigation Into Qwest's Infrastructure Investment, Case No. 04–00237–UT**

{9} In the first year of the AFOR plan, Qwest invested $275.2 million in infrastruc-ture, $117.6 million above the AFOR yearly average of $157.6 million. Having fulfilled the investment commitment and the service quality standards, Qwest's price cap for residence basic exchange service was raised from $10.66 to $12.25, under Section V.A.1.b of the AFOR plan. In the AFOR plan's second year, Qwest invested $68.1 million in its infrastructure. While this was a significant decrease from the previous year, the $343.3 million investment over the first two years was $28.1 million above the $315.2 million required over those two years. Pursuant to Section V.A.1.c, this level of investment and the fulfillment of other service quality standards entitled Qwest to a second residence basic exchange service price cap increase of $1.25. In the third year, Qwest invested $85.4 million, but was $45 million short of the expected cumulative investment of $472.8 million.

{10} PRC staff for the first time expressed concern over the decline in Qwest's infrastructure investment levels during the filing of Qwest's annual compliance report for year two and notice regarding the second residence basic exchange service price cap increase. As a result, pursuant to the reopener provision of the AFOR plan, the PRC opened a docket to explore whether Qwest would remain compliant with the AFOR investment obligation and what remedial measures might be necessary to ensure Qwest's compliance.

{11} Qwest argued that any investigation was premature and speculative, and that a remedial process was unnecessary. It argued that it was in substantial compliance after the third year because it had reached 90 percent of the investment target required after year three. In other words, Qwest was only $45 million short. Qwest also averred that the $788 million investment was (1) no longer necessary because it had succeeded in meeting and exceeding the AFOR plan service quality benchmarks, and (2) unfeasible because of the economic downturn in the telecommunications sector. Qwest submitted a status report which stated that significant, negative, and unanticipated changes in the telecommunications sector had occurred

since the AFOR plan was entered into which "argues against expenditure of $788 million ... as ... originally projected." Nita Taylor, then Qwest's Director of Regulatory Affairs, reaffirmed the PRC's authority to revise the AFOR and reconsider the amount of the infrastructure investment or extend the period for Qwest to be compliant.

{12} The PRC concluded that the AFOR plan and order did not consider any "substantial compliance" standard for the investment commitment. Additionally, the PRC observed that if Qwest's investment continued at the pace of the first two quarters of year four, Qwest's total investment shortfall would be in the range of $220 million. The PRC also explained that there was no support for Qwest's position that the AFOR plan investment commitment was tied only to the service standards. Finally, the PRC asserted that while Qwest argued that the telecommunications economic downturn should relieve it of the investment commitment, at no time did Qwest represent that it could not fulfill the commitment. Due to Qwest's acknowledgment that it would fall short of the investment commitment, the PRC determined that it must address the prospect of a shortfall and put a remedial process in place.

{13} The parties made suggestions regarding the appropriate remedial process. While the PRC acknowledged that it would be premature to impose any penalties for violations until after the AFOR plan five-year term was completed, it determined that an incentive would be appropriate to ensure that Qwest would fulfill the $788 million infrastructure investment. The PRC ultimately decided on an incentive in the form of consumer credits or refunds in an amount equal to any eventual shortfall in the investment commitment. Acknowledging that the parties had not devoted any time to the details of a credit or refund procedure, the PRC opened Case No. 05–00094–UT to determine (1) Qwest's ultimate compliance with the $788 million investment commitment at the end of the AFOR plan five-year term, and (2) the refund or credit procedure's implementation and enforcement. The PRC issued a final order, including its findings and conclusions, on April 14, 2005.

{14} Qwest timely appealed the PRC's final order to this Court. The Supreme Court has jurisdiction under Sections 63–7–1.1(E) and 63–9A–14, and Rule 12–102(A)(2) NMRA. We allowed the General Services Department of the State of New Mexico (GSD) to intervene and file a brief in opposition to Qwest's appeal, under Section 63–9A–14, as a party "whose rights may be directly affected by the appeal."

## II. STANDARD OF REVIEW

{15} Section 63–9A–16 of the New Mexico Telecommunications Act states the applicable standard of review of an appeal of the PRC's orders. "The supreme court shall affirm the [PRC's] order unless it is: (1) arbitrary, capricious or an abuse of discretion; (2) not supported by substantial evidence in the record; or (3) otherwise not in accordance with law." Section 63–9A–16(B); *see also El Vadito de los Cerrillos Water Ass'n v. Pub. Serv. Comm'n,* 115 N.M. 784, 787, 858 P.2d 1263, 1266 (1993) (stating the applicable standard of review).

## III. DISCUSSION

### A. Overview

{16} The core issue in this appeal involves Qwest's AFOR plan commitment to invest a total of $788 million in its New Mexico network infrastructure. Qwest argues that the PRC's incentive, the consumer credit or refund in an amount equal to the investment shortfall, is not in accordance with law because (1) the PRC lacks statutory authority to order Qwest to issue customer credits or refunds, (2) this order violates the rule against retroactive remedies, (3) the order was motivated by an impermissible objective of economic development and job growth, and (4) the order is premature and speculative because the AFOR plan term was not yet completed. The PRC argues that its order is authorized by law under its plenary power to regulate telecommunications and to interpret and enforce the AFOR plan; it is merely enforcing the AFOR plan that Qwest had agreed to and not appealed; and the AFOR plan expressly gives it the power to provide additional incentives to ensure

Qwest's compliance. The PRC generally denies that its order is in the form of retroactive remedy or that it was substantially based on any impermissible objective and asserts that the order is not premature or speculative because Qwest has been found non-compliant.

{17} We affirm the PRC. We agree that the PRC has broad authority to regulate telecommunications in New Mexico and find that the New Mexico Telecommunications Act explicitly authorized the PRC to enter into the AFOR plan and add the consumer credit or refund order incentive. The PRC's consumer credit or refund order was based primarily on the AFOR plan terms and is not a prohibited form of retroactive remedy. The incentive order is neither premature nor speculative because Qwest admitted it would not meet the $788 million investment commitment and that it should not be forced to comply.

{18} Qwest alleges that the credit or refund order should still be set aside even if authorized. It is Qwest's position that the PRC could have found Qwest to be in compliance with the investment commitment after year three because Qwest was substantially compliant, or alternatively, because the PRC had found a different telecommunications company, having completed 94 percent of its investment commitment and regulated under a different AFOR plan, to be compliant. According to Qwest, the PRC order is defective because the order failed to include software expenses toward the infrastructure investment, and relied on unsworn statements that were not subjected to cross-examination and the undisclosed advice of an expert. We affirm the PRC on all these issues because the PRC's order was not arbitrary, capricious, or an abuse of discretion; because it was supported by substantial evidence in the record; and because it is in accordance with the law.

## B. The Consumer Credit or Refund Incentive Order

### 1. The Consumer Credit or Refund Incentive is Implicitly Authorized by the Legislature

{19} Qwest argues that no statute authorizes the PRC's order that Qwest issue consumer credits or refunds in the amount of an investment shortfall. The PRC argues that its plenary authority to regulate telecommunications services within New Mexico, as provided by the Legislature and the New Mexico Constitution, authorizes the incentive.

{20} Agencies are created by statute, and limited to the power and authority expressly granted or necessarily implied by those statutes. *PNM Elec. Servs. v. Pub. Util. Comm'n*, 1998–NMSC–017, ¶ 10, 125 N.M. 302, 961 P.2d 147. Statutory interpretation is a question of law which we review de novo. *Pub. Serv. Co. v. Pub. Util. Comm'n*, 1999–NMSC–040, ¶ 14, 128 N.M. 309, 992 P.2d 860. "Because statutory construction is outside the realm of the Commission's expertise, we afford little, if any, deference to the Commission on this matter." *Id.* (citation omitted). Our primary concern is to determine and give effect to legislative intent, looking first to the plain language of the statute. *Id.* ¶ 18. We hold that the New Mexico Telecommunications Act and the AFOR plan and order authorize the PRC's credit or refund incentive.

{21} The New Mexico Constitution, article XI, section 2, gives the PRC the "responsibility for regulating . . . transmission and pipeline companies, including telephone, telegraph and information transmission companies . . . in such manner as the legislature shall provide." The Public Regulation Commission Act, Section 8–8–4, sets out the general powers and duties of the PRC. The PRC "shall administer and enforce the laws with which it is charged and has every power conferred by law." Section 8–8–4(A). The PRC is also given discretion to "take administrative action by issuing orders not inconsistent with law . . . and to enforce those orders by appropriate administrative action and court proceedings." Section 8–8–4(B)(5). Specifically regarding telecommunications companies, the Legislature has given the PRC authority to "fix, determine, supervise, regulate and control all charges and rates of . . . telegraph, telephone . . . and transmission companies," Section 63–7–1.1(A)(1), "change, amend and rescind rates," Section

63–7–1.1(A)(5), and "determine and decide any question and to issue orders relating to its powers and duties," Section 63–7–1.1(D). Similarly, this Court has recognized the PRC's broad authority to regulate telecommunications, and to take appropriate measures to protect consumers. *Att'y Gen. v. Pub. Reg. Comm'n (In re Proposed Merger of Qwest)*, 2002–NMSC–006, ¶ 6, 131 N.M. 770, 42 P.3d 1219.

{22} In the 2000 amendments to the New Mexico Telecommunications Act, the Legislature stated its intent

> to permit a regulatory framework that will allow an orderly transition from a regulated telecommunications industry to a competitive market environment. It is further the intent of the legislature that the encouragement of competition in the provision of public telecommunications services will result in greater investment in the telecommunications infrastructure in the state, improved service quality and operations and lower prices for such services.

Section 63–9A–2. The Legislature also declared that telecommunications providers are subject to the Act, and "the regulation thereof ... provided." Section 63–9A–5. Section 63–9A–8.2(C) ordered the PRC to eliminate rate of return regulation and implement AFORs for large telecommunications carriers like Qwest. Reading the New Mexico Constitution, the Public Regulation Act, and the New Mexico Telecommunications Act together, we find the Legislature sought creation of a new form of regulation for telecommunications providers and left regulatory authority to the PRC. Pursuant to Section 63–9A–8.2(C), the PRC eliminated rate of return regulation for Qwest and implemented an AFOR plan. Section 63–9A–11 expressly grants the PRC the authority to hear complaints alleging violations of any order or rule pursuant to the Act, and to issue a decision.

{23} Having found that the PRC had the authority to enter into the AFOR plan, we turn to the PRC's authority under the plan. The express terms of the AFOR plan provided two separate responsibilities for Qwest: the $788 million infrastructure investment and the service standards. The AFOR plan separated the infrastructure investment commitment, found in Section VIII, from the service standards in Section IX. Section II of the AFOR plan expressly states that Qwest commits to the infrastructure investment during the plan's five-year term. The reopener provision, Section X.B.5.e, gives the PRC authority to modify the AFOR plan to ensure future compliance with "service standards *or* investment commitments." (Emphasis added.) The AFOR order also laid out the statutory authority for the reopener provision.

{24} Qwest does not argue that the AFOR plan and order were themselves improper exercises of the PRC's authority. Testimony from Qwest executives shows that Qwest was well aware of the nature of the investment commitment and the risk involved with making that commitment five years in advance. Qwest also does not claim that the benefits received from the AFOR plan, the settlement of the eight pending utility cases and the two residence basic exchange service price cap increases, were beyond the PRC's authority. Finally, Qwest did not appeal the original AFOR plan or order.

{25} Qwest's argument rests on the fact that no statute expressly gives the PRC the authority to order Qwest to issue a credit or refund. Qwest relies in part on *In re Proposed Merger of Qwest*, 2002–NMSC–006, ¶ 4, 131 N.M. 770, 42 P.3d 1219, where this Court upheld a PRC determination that it had no statutory authority to approve or disapprove telecommunications mergers. In that case, however, we explicitly upheld the PRC's broad authority to regulate telecommunications rates and services. *Id.* ¶ 6. Here, the AFOR plan and order are within the PRC's express authority to regulate Qwest. While the Legislature did not expressly give the PRC the authority to issue consumer credits or refunds, the New Mexico Telecommunications Act and PRC's broad regulatory authority demonstrate the Legislature's intent to authorize the PRC to approve the terms of individual AFOR plans. The authority to choose a proper incentive to ensure compliance with those terms, expressly found in the AFOR plan, is implicit in the Legislature's grant of authority.

{26} Qwest also compares this case to *ENMR Telephone Cooperative v. State Corporation Commission*, 118 N.M. 654, 884 P.2d 810 (1994), in which we found that the State Corporation Commission had no express statutory authority to order a telephone cooperative to pay the cost of a regulatory audit. In that case, the Court recognized "the Commission['s] broad authority to act in the public interest in matters of ratemaking and in matters of public convenience and necessity." *Id.* at 655, 884 P.2d at 811. However, we denied the Commission's argument that the New Mexico Constitution, article XI, section 7 (repealed 1999), provided broad enough authority that the Commission could act outside of statute. *Id.* at 656, 884 P.2d at 812. Since we find the PRC credit or refund incentive implicitly authorized by statute in this case, Qwest's argument is unpersuasive.

■ {27} Qwest argues that there are statutory limits to the PRC's enforcement authority. The PRC "may apply to the district court for injunctions to prevent violations of any provision of the New Mexico Telecommunications Act ... or of any rule or order of the [PRC] issued pursuant to that act," Section 63–9A–20, and "impose an administrative fine on a telecommunications provider for any act or omission that the provider knew or should have known was a violation of any applicable law or rule or order of the [PRC]," NMSA 1978, § 63–7–23(B) (2000). Qwest argues that the PRC is limited to these two mechanisms to enforce Qwest's compliance. We refuse to so limit the PRC's regulatory authority. The Legislature has given the PRC the discretion "to enforce [its] orders by appropriate administrative action *and* court proceedings." Section 8–8–4(B)(5) (emphasis added). Since the Legislature has implicitly authorized that the PRC create and enforce this incentive on Qwest, the incentive is an appropriate administrative action. We find that these statutes provide the PRC additional avenues to prevent violations of the New Mexico Telecommunications Act.

## 2. The Consumer Credit or Refund Does Not Violate the Rule Against Retroactive Remedies

■ {28} Qwest next avers that the consumer credit or refund order violates the rule against retroactive remedies because the order is a remedial measure, and the AFOR plan is legislative in nature. The PRC generally denies that the credit or refund is a retroactive remedy because it is a proper use of its authority to change, amend and rescind rates, and affirms its duty to protect New Mexico consumers.

{29} Qwest cites to *Mountain States Telephone & Telegraph Co. v. State Corporation Commission*, 90 N.M. 325, 341, 563 P.2d 588, 604 (1977), for the general rule that, "[r]etroactive remedies, which are in the nature of reparations rather than rate-making, are peculiarly judicial in character, and as such are beyond the authority of the Commission to grant." Our statement in *Mountain States* alone does not preclude the PRC from implementing a retroactive procedure. In *Hobbs Gas Co. v. Public Service Commission*, 115 N.M. 678, 684, 858 P.2d 54, 60 (1993), the State Corporation Commission unreasonably and unlawfully ordered the gas company to issue refunds when the commission abruptly changed methodologies without giving the company notice. The Court used a retroactive lawmaking analysis to determine the propriety of applying new regulatory interpretations and adopted a five-factor balancing test to determine if an administrative agency's adjudicatory rulemaking should be applied only prospectively:

> (1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard.

*Id.* at 682, 858 P.2d at 58 (quoted authority omitted). The holding in *Hobbs Gas* that a refund was unauthorized was based on fair-

ness to the company, which had reasonably relied on the commission's previous practice. *Id.* at 684, 858 P.2d at 60. Applying the factors to this case, we find that Qwest had proper notice of its $788 million infrastructure investment commitment, and therefore, the credit or refund incentive is not an impermissible retroactive remedy.

{30} Under factor one, whether the case is one of first impression, AFOR plans are new forms of regulation that the PRC has not previously enforced. This is the first time that the PRC has dealt with Qwest's non-compliance with AFOR plan terms. Factor two, whether the new rule represents an abrupt departure from well-established practice or merely attempts to fill a void in an unsettled area of law, also favors the PRC because it is not departing from established rules, but simply following AFOR plan terms. The AFOR plan explicitly empowers the PRC to add incentives should they be necessary to ensure that Qwest fulfills its obligations. Under the AFOR plan terms, the PRC determined that a credit or refund option would best ensure Qwest's compliance with the infrastructure investment commitment. Factor three, the extent to which the party against whom the new rule is applied relied on the former rule, is not an issue because there was no former rule that Qwest relied upon. As to factor four, the burden the retroactive order imposes on a party, Qwest argues that it is a great burden to pay upward of $200 million over the AFOR plan's two remaining years. While spending any amount of money may be burdensome for a corporate entity, Qwest was aware in 2001 that it was obligated to invest $788 million in its New Mexico infrastructure. Qwest also argues that changed circumstances, such as a telecommunications economic downturn, increased competition, and losses in traditional revenue, make the infrastructure investment unnecessary and increase its burden. We find such claims are insufficient to demonstrate a burden on Qwest because comments by Qwest executives during AFOR plan hearings demonstrated the company was aware that it would be held to its commitment in spite of external forces. Factor five, the statutory interest in applying a new rule despite the reliance of a party on the old

standard, does not apply because, as stated under factor three, Qwest had no former rule on which to rely.

{31} Qwest also cites a number of cases in which an administrative commission's order of a consumer refund or credit was found to be outside the commission's authority. *See id.* at 684, 858 P.2d at 60; *Gen. Tel. Co. of the Sw. v. Corp. Comm'n,* 98 N.M. 749, 756–58, 652 P.2d 1200, 1207–09 (1982) (finding the commission without authority to decrease telephone company's rates, thereby retroactively reducing what the commission had previously determined to be fair, just, and reasonable rate of return for the company); *S.C. Elec. & Gas Co. v. Pub. Serv. Comm'n,* 275 S.C. 487, 272 S.E.2d 793, 795 (1980) (finding a commission order for a refund was unauthorized retroactive rate-making when the commission had previously approved the company's rate). These cases provide no guidance because, as Qwest readily admits in its briefs, the cases cited were all under the previous rate of return scheme. The PRC's consumer credit or refund incentive was made under an alternative form of regulation. Unlike the different administrative commissions listed above, we have already found that the PRC had the implied statutory authority to order the credit or refund incentive in this case. Consequently, we find Qwest's retroactive remedy argument without merit.

### 3. The PRC's Credit or Refund Order Did Not Impermissibly Rely on Economic Objectives

{32} Qwest claims that the PRC's order was motivated by an impermissible objective of increasing economic development and job growth in New Mexico. The PRC avers that its order does not primarily rely on this objective. Qwest asks us to find that the PRC deviated from its statutory duty to regulate utilities according to the law based on one paragraph in the PRC's final order which states, "[i]nvestment in telecommunications infrastructure is an especially important, if not crucial, factor in stimulating business activity, economic development and job creation throughout all sectors of New Mexico's economy." (Footnote omitted.) One

statement in a sixty-five page order does not demonstrate the PRC relied primarily on this factor. The statement was made in the context of describing the AFOR plan hearings in which Qwest executives discussed the benefits to New Mexico and Qwest. To put the statement in context, the statement preceded a description of the infrastructure improvements Qwest could make to its network in response to Qwest's claim that its completion of service standards was all the investment the AFOR plan required.

{33} The Legislature explicitly stated in the New Mexico Telecommunications Act that its intent in entering into an alternative form of regulation regime was to encourage competition, resulting in greater investment in the telecommunications infrastructure, improved service quality, and lower rates. Section 63–9A–2. The PRC approved the AFOR plan pursuant to this legislative directive. The PRC order merely states another benefit that New Mexico would receive if Qwest were to comply with the terms of the AFOR plan. Therefore, the PRC's order is not defective on these grounds.

### 4. The Consumer Credit or Refund Order is Not Premature or Speculative

■ {34} Qwest urges this Court to set aside the consumer credit or refund order because the five-year term of the plan is not over and Qwest could be compliant with the $788 million investment commitment before the end of the plan. Qwest has invested $427.8 million, about 90 percent of its investment obligation through year three.

{35} The PRC order was made pursuant to an investigation of whether Qwest would likely remain compliant with the investment commitment, and if not, what incentives should be developed to ensure compliance. Qwest never contested the PRC staff's contention that Qwest would fall short of the total investment commitment. In fact, Qwest's position was that the entire $788 million investment commitment was no long-

er necessary and that any investment should be viewed in the context of the AFOR plan service standards. In Qwest's view, the service standards were its only binding obligation. Qwest urged the PRC to use its authority to reopen the AFOR plan in order to decrease the investment commitment. When the PRC requested that Qwest determine potential infrastructure projects Qwest could use to meet the investment commitment, Qwest announced, "the entire balance does not need to be spent and should not be spent. Expecting Qwest to devise a plan it could not endorse is thus no more reasonable or satisfactory." Qwest would negotiate only when other parties were willing "to set aside their preoccupation with $788 million or any other specific number." We find the consumer credit or refund incentive order was not based on speculation but on this substantial evidence. Consequently, we deny Qwest's request to set aside the order on these grounds.

{36} The PRC opened Case No. 05–000094–UT to determine Qwest's ultimate compliance with its AFOR plan. If Qwest completes its investment commitment and the service standards, Qwest will not be subject to any consumer refund or credit. If an error were to arise under this new case, Qwest would have the opportunity to appeal to this Court.[5]

### C. The PRC's Finding That the AFOR Plan Does Not Recognize "Substantial Compliance" Does Not Make the Consumer Refund or Credit Order Defective

■ {37} According to Qwest, the PRC's refund or credit order should be set aside since the PRC could have found Qwest to be substantially compliant with the AFOR plan because (1) Qwest had fulfilled most of its AFOR plan commitments, or (2) the PRC had found a different communications company, VALOR Telecommunications of New

---

**5.** This opinion does not prevent the PRC, Qwest, and other parties from broadening the scope of Case No. 05–000094–UT to consider other mechanisms to enforce the investment commitment. *See* § 63–7–1.1(D) (giving the PRC the power to issue orders relating to its powers and duties); NMAC 17.1.2.25 (2001) ("The Commission may at any time investigate any matter within its jurisdiction."); NMAC 17.1.2.34(H) (permitting the consolidation of two or more proceedings involving a similar question of fact).

Mexico, to be in substantial compliance with its respective investment commitment. The PRC argues that the AFOR plan does not include the concept of "substantial compliance," that Qwest admitted it would be non-compliant with the investment commitment, and that VALOR's AFOR compliance provides no guidance on determining Qwest's AFOR non-compliance. We agree with the PRC.

{38} The PRC order should be set aside only if it is arbitrary, capricious or an abuse of discretion; not supported by substantial evidence in the record; or otherwise *not in accordance with law.* Section 63–9A–16(B). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Att'y Gen. v. Pub. Util. Comm'n*, 2000–NMSC–008, ¶ 6, 128 N.M. 747, 998 P.2d 1198. The Supreme Court analyzes the entire record when determining whether substantial evidence supports the PRC's order. *Id.* ¶ 4. The PRC's order is rejected "only if conflicting evidence renders incredible the evidence in support of the decision." *Id.* ¶ 6.

{39} First, we turn to the existence of a substantial compliance standard in Qwest's AFOR plan. During the investigation hearings, Qwest for the first time argued that the PRC could find that Qwest was substantially compliant with the AFOR plan as a whole. Qwest conceded that the AFOR plan contained no substantial compliance definition, but argued that a definition was unnecessary because Qwest was meeting a number of its commitments, such as 90 percent of the investment obligation and all the service quality standards, over the first three years. As Qwest admitted, however, there is no substantial compliance standard applicable the overall completion of its two commitments. With regard to the investment commitment, the AFOR plan states unequivocally that "Qwest commits to invest a total of $788 million in its New Mexico network infrastructure over the 5–year term of the Plan." The number was not randomly arrived at by the parties, but was part of the settlement of Qwest's pending cases and a commitment by Qwest to invest 25 percent more than it had over the last five-year period. Throughout the plan, the two commitments were treated as separate and independent of one another. In particular, the reopener provision, Section X.B.5.e, gives the PRC the authority to "modify the [AFOR plan] to ensure future compliance with service standards *or* investment commitments." (Emphasis added.) Section VIII dealt with the $788 million infrastructure commitment, while Section IX described the quality service commitment. The wording of the AFOR plan clearly states the investment commitment was not based on service standards.

{40} Qwest urges this Court to read a substantial compliance standard as permissible and applicable under statute. Section 63–9A–12 states, "[a] substantial compliance by the [PRC] with the requirements of the New Mexico Telecommunications Act [63–9A–1 NMSA 1978] shall be sufficient to give effect to all rules, orders, acts and regulations of the [PRC]. . . ." While the statute does include the terms "substantial compliance," there is no support for Qwest's contention that this should apply to its compliance with the AFOR plan. The statute clearly considers substantial compliance only by the PRC with the New Mexico Telecommunications Act. *Cf. Ferguson–Steere Motor Co. v. State Corp. Comm'n*, 60 N.M. 114, 288 P.2d 440 (1955) (interpreting a similar statute to find that a state corporation commission's order was not defective when it failed to include a jurisdictional finding of fact).

{41} Second, we address whether the PRC's treatment of VALOR communications, which was subject to different investment and service quality commitments, merits a finding that Qwest is substantially compliant with the AFOR plan. In the third year of VALOR's five-year AFOR plan, the PRC had found VALOR to be in compliance with its investment commitment when VALOR had invested 94 percent of the expected amount through the VALOR AFOR plan's first three years. Intervenor GSD contends that Qwest's own AFOR order stated that VALOR's AFOR plan would serve no precedential value. Furthermore, the PRC contends that although VALOR had not met 100 percent of its investment commitment after year three, it determined that VALOR was in compli-

ance, without mention of a substantial compliance standard. We agree with the PRC and GSD. In Qwest's AFOR order, the PRC explained the importance of evaluating AFOR plans on a case-by-case basis. The PRC specifically recognized that Qwest's AFOR plan "should have no precedential value." Therefore, Qwest had notice that VALOR's AFOR plan and Qwest's AFOR plan, and any subsequent investigations, would not have precedential value for the other.

{42} VALOR's AFOR plan was created under distinct circumstances and created different obligations than those developed under Qwest's AFOR plan. VALOR's total investment commitment was $83 million, or $16.6 million per year. VALOR's investment report showed an investment of $42.9 million after year three, below the $49.8 million expected. While Qwest argues that this shows that the PRC acknowledges a principle of substantial compliance with investment commitments, factual differences between VALOR and Qwest's compliance lead to different results in each case. Unlike Qwest, VALOR never challenged the validity of its AFOR plan investment commitment, never argued the commitment was no longer necessary for compliance, nor that it would not comply with the total investment commitment. Also, the substantial investment reduction resulted in an investigation of whether Qwest would be compliant with its investment obligation. Because VALOR's investment has remained steady, PRC staff have not recommended an investigation nor found that VALOR has been anything but compliant with its commitments. For this reason, we find that the PRC did not act arbitrarily, capriciously, or abuse its discretion in not applying a substantial compliance standard to Qwest.

{43} It is also questionable whether Qwest can be found substantially compliant with the AFOR plan even if such a standard existed. When confronted with concerns that it could fall short over $200 million of the infrastructure investment commitment, Qwest did not claim it would meet the target at the end of five years, but only that the target should no longer apply. According to Qwest, PRC staff and the other interveners were focusing too narrowly on the $788 million investment

commitment without acknowledging the benefits that had been realized by New Mexico consumers in other areas. The PRC found in its order, however, that in each of Qwest's first two quarterly reports for year four Qwest averaged $19.5 million of investment. Based on the quarterly reports, the PRC projected a total investment of $78 million at the end of year four. This would place Qwest at only 80 percent, or $505.8 million of the required $630.4 million investment, through year four. This rate of investment would place Qwest's compliance level even lower at the end of the AFOR plan five-year term. Qwest has never argued that its investment would increase to meet compliance levels. Based on this uncontested evidence, the PRC found Qwest would not be compliant, substantially or otherwise, with the investment commitment at the end of the AFOR plan five-year period. Therefore, we find that the PRC did not err in determining that the AFOR plan did not consider substantial compliance.

## D. The PRC Did Not Abuse Its Discretion in Excluding Qwest's $46 Million in Software Expenses From the Investment Commitment

■ {44} At the compliance investigation hearings, Qwest argued that $46 million in software expenses should count toward the $788 million investment commitment. The American Institute of Certified Public Accountants Statement of Position (SOP) 98–1 requires capitalization of software costs, and this position has been adopted by the Federal Communications Commission (FCC). Qwest already counts its interstate capitalized software costs as investment in its annual reports and seeks to add its intrastate costs. In the credit or refund order, the PRC agreed with Qwest's interpretation of SOP 98–1, but refused to credit the entire $46 million toward Qwest's investment commitment. The PRC ordered that only software expenses that were incrementally higher than pre-AFOR levels would count toward the investment commitment because this would be consistent with the AFOR plan objective of increased investment. Because no evidence was presented as to what Qwest's software expenses were before the

AFOR plan term, the PRC deferred the determination of what software expenses would be counted toward the investment commitment for investigation under Case No. 05–000094–UT. Qwest avers the PRC cannot modify SOP 98–1 by counting only software costs above the pre-AFOR baseline period. Because no party contested Qwest's reading of SOP 98–1, Qwest charges the PRC's modification of SOP 98–1 was arbitrary and capricious. Qwest also observes that if it could add these software expenses to the investment already made, it would be compliant over the AFOR plan's first three years.

{45} The original AFOR plan and order clarify the PRC's position on the issue. Contrary to its position on appeal, Qwest admits it opposed the capitalization of software expenses in AFOR plan negotiations while other parties supported the SOP 98–1 position. Qwest opposed the capitalization of these expenses because it would have caused significant fluctuations in revenue requirements during the AFOR plan. Qwest witnesses testified that including software expenses at the AFOR plan's onset would embed a highly negative revenue requirement into Qwest's expense structure, weighing against the benefits that Qwest would ultimately receive from the AFOR plan. PRC staff and GSD allege that Qwest's position allowed it to benefit under rate of return regulation. The AFOR plan was ultimately silent on whether these costs should be capitalized or expensed, but Qwest determined that it would continue to expense the costs for intrastate ratemaking purposes. Qwest also requested that the AFOR plan investment commitment be measured according to its Jurisdictional Report 21 (JR 21) because JR 21 was a standard accounting document that it already generated for reporting capital expenditures in the state. JR 21 did not include intrastate software costs, but Qwest asked that JR 21 be the measure of its investment commitment.

{46} Qwest revealed its desire to change its position on SOP 98–1 in rebuttal testimony during the PRC's investigation into Qwest's compliance with the investment commitment. Qwest claimed that it changed its position after an internal study to determine if it could eliminate any state-specific accounting practices, including those that reflected differences between FCC regulations and state commission regulations. Recognizing that New Mexico regulations are silent on this state's adoption of FCC accounting principles, including SOP 98–1, Qwest determined that it should have originally advocated for the inclusion of SOP 98–1 for New Mexico accounting purposes.

{47} PRC staff and others took issue with the timing of Qwest's change of position on SOP 98–1 because if Qwest were allowed to include the $46 million in software expenses it would be compliant with the infrastructure investment for year three. GSD asserts that Qwest did not want to include these software expenses when negotiating the AFOR plan in order to set a higher intrastate rate. The AFOR plan standards, commitments, and benefits were determined based on Qwest's original position, and now Qwest's change in position would allow it to receive another benefit. PRC staff also argued that Qwest should not be permitted to add these software expenses because Qwest alerted the PRC of its change of position on SOP 98–1 only during rebuttal testimony, and, therefore, did not allow any other party to offer testimony on this point.

{48} In 1999, the FCC allowed carriers to use SOP 98–1 and ordered all telecommunications carriers to "account for computer software costs in accordance with" generally accepted accounting principles. *In re 1998 Biennial Regulatory Review*, 14 F.C.C.R. 11396, 11418–19, 1999 WL 1279849 (1999). However, the FCC did not amend all its rules, remarking that "[t]he changes in accounting standards which this Commission approves will not necessarily be binding on the ratemaking practices of the various state commissions." 47 C.F.R. § 32.16(b) (2002). Therefore, the FCC's adoption of SOP 98–1 is not necessarily binding on the PRC. Under these facts, we find the PRC worked within its authority to fashion a compromise by permitting Qwest to include only intrastate software investment above pre-AFOR levels to count toward the investment commitment. The PRC made a determination within its authority that was not arbitrary or capri-

cious, and it was supported by substantial evidence. *See* Section 63–9A–16(B); *El Vadito de los Cerrillos Water Ass'n,* 115 N.M. at 787, 858 P.2d at 1266.

### E. The PRC's Credit or Refund Order Did Not Improperly Rely on Unsworn Statements or Statements Not Subject to Cross–Examination

{49} Qwest contends that the PRC's credit or refund order is defective because it relied on two improper forms of evidence. The PRC order cited a statement from the Santa Fe mayor, a non-party, and a post-hearing statement by the Department of Defense and all other Federal Executive Agencies (DOD/FEA). According to Qwest, these statements were not properly admitted into evidence nor subjected to cross-examination. The PRC responds that it based its order on evidence in the record, and that the information to which Qwest objects was redundant and not necessary for the PRC's decision.

{50} Section 8–8–4(B)(10) allows the PRC to adopt "reasonable administrative, regulatory and procedural rules" to carry out its duties. Pursuant to this legislative directive, the PRC has passed rules to conduct hearings. A non-party is afforded the opportunity to comment on the record, "but such statement shall not be considered by the [PRC] as evidence." NMAC 17.1.2.26(F) (2001). Regulations also allow a non-original party to intervene in a proceeding, NMAC 17.1.2.26(A), and if the intervention motion is granted, the entity has the same rights as original parties, NMAC 17.1.2.26(D)(7). Such rights include submitting proposed findings and conclusions, orders, and briefs. NMAC 17.1.2.38.

{51} The mayor wrote a statement that was read during Qwest's compliance hearings. Qwest does not argue that reading the statement was improper, only that the PRC improperly relied on it as evidence in its consumer credit or refund order. The order cites the mayor's testimony regarding service deficiencies in the Santa Fe area,

including aged infrastructure, DSL unavailability, new service installation delays, and service quality problems, to show that Qwest has investment opportunities to improve its infrastructure.

{52} Qwest also complains of the order's citation to the Reply Statement of the DOD/FEA, which was submitted in lieu of a response brief on February 18, 2005, pursuant to NMAC 17.1.2.38.A. The PRC order referred to the DOD/FEA's Reply Statement to buttress the argument that infrastructure inadequacies existed at Los Alamos National Laboratory and White Sands Missile Range. Qwest argues that the PRC improperly relied on the DOD/FEA statement because it was submitted after hearings and not subject to cross-examination.

{53} The PRC and GSD aver that any error in including this material is harmless because these statements were redundant of existing evidence before the PRC. A GSD witness testified to the planned installation of diversity routed fiber rings in the Santa Fe area which had not been completed, and a Qwest witness was cross-examined on this infrastructure concern, DSL deficiencies across the state, and Qwest's aging telecommunications lines. The DOD/FEA concerns regarding Los Alamos and White Sands were addressed in cross-examination of Qwest witnesses by DOD/FEA counsel, as well as in DOD/FEA's Position Statement of February 3, 2005.[6]

{54} The mayor and DOD/FEA's statements are cited in just two paragraphs of the PRC's 65–page final order. The statements were cited to demonstrate existing infrastructure improvement needs and to contest Qwest's claim that its fulfillment of service standards should relieve it from fulfilling the investment commitment. These two specific citations were followed by evidence properly before the PRC, which addressed service deficiencies that Qwest could correct and count toward the AFOR plan investment commitment. We find the DOD/FEA state-

---

**6.** The PRC ordered all parties to submit briefs-in-chief on February 4, 2005, and response briefs on February 18. The DOD/FEA submitted statements instead of briefs, and the information con-

tained in its reply statement referred back to the DOD/FEA Statement of Position submitted February 3, 2005.

ment was proper evidence included in the credit or refund order because DOD/FEA was a party, and Qwest had notice of the statement's contents. Because there was substantial evidence properly before the PRC, inclusion of the mayor's statement is not reversible error, and we affirm. However, we caution the PRC to take care in citing to proper evidence in its orders. If this were a case in which the mayor's statements were the only source of Qwest's infrastructure deficiencies, we could have been forced to overrule the PRC's determination of the existence of infrastructure deficiencies.

## F. The PRC's Refusal to Disclose Nonparty Expert Advice Was Not Error

{55} Qwest complains that the PRC improperly relied on the advice of a nonparty expert, Dr. David Gabel, in its order. The record is silent on the exact nature of Dr. Gabel's advice to the PRC, but the PRC's consumer credit or refund order generally identifies him as a contract consultant, with expertise in "regulatory law, telecommunications and economics" and who "reviewed the record in this case and furnished assistance and advice to the [PRC] on matters of record during [PRC] deliberations in closed sessions." Whether the PRC erred turns on whether Dr. Gabel is a non-party expert whose advice must be shared with the parties, or advisory staff whose advice need not be shared. Qwest argues that Dr. Gabel is a non-party expert and his advice should have been disclosed in order to give Qwest an opportunity to respond, and that the PRC's failure to disclose the advice violated rules governing ex-parte communications. The PRC contends that Dr. Gabel is advisory staff, and therefore his advice is permissible ex-parte communication that need not be shared with the parties. In a different case, the PRC found Dr. Gabel to be advisory staff and denied a request from the attorney general who, like Qwest in this case, asked for the substance of Dr. Gabel's advice.

{56} Ex-parte communication is "a direct or indirect communication with a party or his representative, outside the presence of the other parties, concerning . . . a pending adjudication, that deals with substantive matters or issues on the merits of the proceeding." NMAC 1.2.3.7(B) (2004); see also NMSA 1978, § 8–8–17(A) (2004) (prohibiting commissioner communications with a party outside the presence of the other parties concerning a pending adjudication). Ex-parte communication is generally prohibited by statute, Section 8–8–17, and the PRC's own administrative rules, see NMAC 1.2.3. There are exceptions, however. The Legislature has permitted PRC commissioners to have ex-parte communications with non-party experts whose advice must be shared with the parties, and with advisory staff whose advice need not be shared.

{57} The non-party expert identified in Section 8–8–17(C)(4) and the advisory staff identified in Section 8–8–17(C)(2) are differentiated by the terms of these statutes. Ex-parte communication with a non-party expert on an adjudicatory issue is allowed "if the commissioner or hearing examiner gives notice to the parties of the person consulted and the substance of the advice and affords the parties reasonable opportunity to respond." Section 8–8–17(C)(4); see also NMAC 1.2.3.9(D). By the terms of Section 8–8–17, non-party experts are those contacted directly by a commissioner and who provide advice on an issue raised in the rulemaking or adjudication. Non-party experts can be contacted by individual commissioners as long as the advice is provided to the parties. The administrative code expressly regulates communications between commissioners and parties, and Dr. Gabel is not a party.

{58} The Public Regulation Commission Act allows the PRC chief of staff to hire advisory staff with expertise in "regulatory law, engineering, economics and other professional or technical disciplines" to assist the PRC. NMSA 1978, § 8–8–13(A) (1998). Section 8–8–17(C)(2) permits ex-parte communications between a commissioner and advisory staff and this need not be shared with the parties. Advisory staff are charged with analyzing case records and recommended decisions; advising the PRC on policy issues; assisting the PRC in the development of rules and in writing final orders; and performing other duties as assigned by the chief of staff, Section 8–8–13(B). Advisory staff

have temporary, term or contract employment relationships with the PRC. Section 8–8–13(A). In the order, Dr. Gabel was identified as a contract consultant who assisted the PRC in areas of his expertise, reviewed the record, and furnished advice on the record in closed sessions.

{59} Statutory construction is an issue which we review de novo. *Pub. Serv. Co. v. Pub. Util. Comm'n*, 1999–NMSC–040, ¶ 14, 128 N.M. 309, 992 P.2d 860. "In construing a particular statute, a reviewing court's central concern is to determine and give effect to the intent of the legislature." *Id.* ¶ 18 (quoted authority omitted). A statute's plain language is the primary indicator of legislative intent. *Id.* Additionally, when different statutes cover the same subject matter, they should be harmonized and construed together in a way that facilitates their operation when possible. *Id.* ¶ 23. We decline to find that the PRC's previous determination about the nature of Dr. Gabel's advice is dispositive of the issue before us because statutory interpretation is the proper function of the Court, and we give little deference to the PRC's own interpretation. *Id.* ¶ 14.

{60} Qwest's concern is that the PRC could circumvent the prohibition against exparte communication and render Section 8–8–17(C)(4) moot by contracting with a non-party expert and classifying the expert as advisory staff and refusing to disclose any aspect of the expert's advice. Because Dr. Gabel's relationship with the PRC and his advice fall within the definition of advisory staff, *see* Section 8–8–13(A), we conclude that the PRC need not provide Qwest and other parties with the substance of Dr. Gabel's advice. Even though we hold in the present case that Dr. Gabel is advisory staff, under another set of facts he could fall under the category of a non-party expert. Because we find no error on this issue, we affirm the PRC's final order.

## IV. CONCLUSION

{61} The PRC had statutory authority to enter into an AFOR plan with Qwest. Qwest advocated for and committed to a $788 million infrastructure investment. The AFOR plan terms explicitly allowed the PRC to reopen the AFOR plan and provide an incentive for Qwest to comply with its investment commitment. The New Mexico Telecommunications Act implicitly authorizes the PRC to order a consumer credit or refund incentive. The PRC's incentive order is not an impermissible retroactive remedy, not motivated by an impermissible objective, nor was it premature or speculative.

{62} The PRC had substantial evidence that Qwest believed it should not be held to the infrastructure commitment and would not complete the investment. The PRC acted within its discretion when refusing to find the existence of a substantial compliance standard and refusing to count Qwest's entire intrastate software expenses toward the investment commitment. The PRC generally relied on proper evidence, and any reliance on improper evidence was harmless. Dr. Gabel is advisory staff and, therefore, the PRC did not err when it refused to disclose the substance of his advice to Qwest. As a result, we affirm.

{63} **IT IS SO ORDERED.**

WE CONCUR: RICHARD C. BOSSON, Chief Justice, PETRA JIMENEZ MAES, and EDWARD L. CHÁVEZ, Justices.

PAMELA B. MINZNER, Justice (concurring in part and dissenting in part).

MINZNER, Justice (concurring in part and dissenting in part).

{64} I respectfully dissent as to Sections III(B)(1) and (2). I concur in the remainder of the opinion except Section III(B)(4), which involves an issue I would not reach. I am not persuaded that the New Mexico Telecommunications Act (the Act), NMSA 1978, §§ 63–9A–1 to –20 (1985, as amended through 2004), expanded the PRC's enforcement powers, and I would conclude that the challenged credit or refund "incentive" was not within the scope of the PRC's statutory authority.

{65} We have previously recognized that enforcement powers are distinct from regulatory powers. *See U.S. West Commc'ns, Inc. v. State Corp. Comm'n*, 1999–NMSC–016,

¶ 55, 127 N.M. 254, 980 P.2d 37 ("[T]he power to change rates is not necessarily the same as the power to *enforce* a rate change.... [T]he latter power is reserved for this Court when the company does not comply with the Commission's order...."). We have been particularly hesitant to find remedial powers implied in statutory language. *Callahan v. N.M. Fed'n of Teachers–TVI*, 2006–NMSC–010, ¶ 25, 139 N.M. 201, 131 P.3d 51 (observing that the Labor Relations Board's power to enforce provisions of statute through "appropriate administrative remedies" did not empower the board to award compensatory damages); *Mountain States Tel. & Tel. v. State Corp. Comm'n*, 90 N.M. 325, 341, 563 P.2d 588, 604 (1977) ("Retroactive remedies, which are in the nature of reparations rather than rate-making, are peculiarly judicial in character, and as such are beyond the authority of the Commission to grant.").

{66} I believe the credit or refund order is essentially remedial. The credit or refund will be imposed as a penalty in the event that Qwest fails to meet the investment requirements of its plan. Because the amount of the credit or refund is tied directly to the shortfall in Qwest's investment, it appears to have been designed to compensate Qwest's customers and the state. In my view, this is "in the nature of reparations" and is not within the statutory authority of the PRC. *See Mountain States*, 90 N.M. at 341, 563 P.2d at 604.

{67} The majority interprets the Act's open-ended "alternative form of regulation" as allowing the PRC a significant amount of flexibility not only in the requirements imposed on telecommunications utilities, but also in how those requirements are enforced. I am not persuaded that the PRC's authorization is quite so broad. The statute did not explicitly alter the enforcement powers of the PRC. NMSA 1978, Section 63–7–23 (2000), states the maximum fines for several different types of violations by telecommunications companies while Section 63–9A–20 permits the PRC to seek an injunction from the district court to prevent violations of PRC orders. There is no indication that the PRC has any special power to enforce an alternative form of regulation beyond its statutory power to enforce any other form of regulation.

{68} Both the wording and the placement of the "alternative form of regulation" language suggest that the Legislature intended to create an alternative only to rate-of-return regulation, not to the entire structure governing the scope and limits of the PRC's authority. Section 63–9A–8.2(C) explicitly instructs the PRC to eliminate rate-of-return regulation for certain large carriers, and to implement an "alternative form of regulation." No changes were made to the more general sections setting out the PRC's enforcement powers and no additional language clarifies the scope of these powers in relation to alternative forms of regulation.

{69} While it could be argued that an "alternative form of regulation" includes an alternative form of enforcement, this is not the only possible reading of Section 63–9A–8.2(C). The PRC's powers, to set rates and direct the development of telecommunications service in New Mexico, were enforced through the statutory mechanisms identified above prior to the adoption of the alternative form of regulation. The PRC had the power to issue fines, alter the rate structure, issue new orders, and seek injunctions from the district courts. Any alternative regulation could be enforced by the same means. I am not persuaded that NMSA 1978, Section 8–8–4(B)(5) (1998), permitting the PRC to "enforce those orders by appropriate administrative action and court proceedings" expands the authority granted more explicitly in Chapter 63. *See Callahan*, 2006–NMSC–010, ¶ 25, 139 N.M. 201, 131 P.3d 51. The amendments to the Act appear to replace only a portion of the earlier statutory regime, and the Legislature left intact the enforcement sections. This can be viewed as some evidence that the Legislature intended the new "alternative form of regulation" to be enforced in the same manner as earlier rate setting regulations.

{70} If the Legislature had intended to significantly expand the PRC's enforcement powers, it seems reasonable to expect that some language in Chapter 63, Article 9A or elsewhere would make that explicit. Furthermore, the PRC cannot grant itself powers beyond those authorized by statute. The provisions of Section 63–9A–8.2(C) can and should be read consistently with the PRC's

statutory powers, not as an expansion of those powers. Qwest's plan reserves for the PRC the right to modify its regulations in response to new developments, but the modifications or incentives are also limited by statute. Thus, the PRC's incentives must fall within the scope of the agency's authority to be proper.

{71} I am concerned that the majority opinion and Section 63–9A–8.2(C) provide no guidance to the PRC regarding the scope of its powers. The statute provides very few parameters for the alternative form of regulation. *Compare* § 63–9A–8.2(C), *with* 220 ILL. COMP. STAT. 5/13–506.1 (2004). It appears that any measure—punitive, positive, or frivolous—that could increase the likelihood of Qwest's compliance with its plan is permitted. I would not conclude that the Legislature granted the PRC such broad authority by implication. Because the majority opinion concludes that the PRC correctly determined that Qwest was unlikely to comply with the investment requirement of its plan, and I agree, I would hold only that the incentive adopted was not within the scope of the PRC's authority, and remand to allow the PRC to select a proper incentive, or to seek enforcement of Qwest's plan in a manner authorized by statute.