The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

Opinion Number:

Filing Date: January 16, 2025

**NO. S-1-SC-39432**

**SOUTHWESTERN PUBLIC SERVICE COMPANY,**

Appellant,

and

**EL PASO ELECTRIC COMPANY, PUBLIC SERVICE COMPANY OF NEW MEXICO,**

Intervenors-Appellants,

v.

**NEW MEXICO PUBLIC REGULATION COMMISSION,**

Appellee,

and

**COALITION FOR COMMUNITY SOLAR ACCESS, RENEWABLE ENERGY INDUSTRIES ASSOCIATION OF NEW MEXICO, CITY OF LAS CRUCES, NEW ENERGY ECONOMY, and COALITION OF SUSTAINABLE COMMUNITIES NEW MEXICO,**

Intervenors-Appellees.

**In the Matter of the Commission's
Adoption of Rules Pursuant to the
Community Solar Act, NMPRC
Case No. 21-00112-UT**

**APPEAL FROM THE NEW MEXICO PUBLIC REGULATION
COMMISSION**

Hinkle Shanor, LLP
Dana S. Hardy
Timothy B. Rode
Santa Fe, NM

Erika M. Kane, Lead General Counsel
Austin TX

for Appellant

Russell R. Fisk, Associate General Counsel
Erin E. LeCocq, Special Counsel
Santa Fe, NM

for Appellee

Jason Marks Law, LLC
Jason A. Marks
Albuquerque, NM

Keyes & Fox LLP
Lee Ewing
Denver, CO

for Intervenors-Appellees Coalition for Community Solar Access, Renewable
Energy Industries Association of New Mexico

PNM Resources, Inc.
Stacey J. Goodwin, Associate General Counsel
Albuquerque, NM

Wilkinson Barker Knauer LLP
Debrea A. Terwilliger
Denver, CO

for Intervenor-Appellant Public Service Company of New Mexico

El Paso Electric Company
Nancy B. Burns, Deputy General Counsel
Santa Fe, NM

Montgomery & Andrews, P.A.
Jeffrey J. Wechsler
Kari E. Olson
Santa Fe, NM

for Intervenor-Appellant El Paso Electric Company

Office of the City Attorney
Jennifer Vega
Jocelyn A. Garrison
Las Cruces, NM

Stevens Law LLC
Anastasia S. Stevens
Santa Fe, NM

for Intervenor-Appellee City of Las Cruces

New Energy Economy
Mariel Nanasi
Santa Fe, NM

for Intervenor-Appellee New Energy Economy

Stephanie Dzur
Albuquerque, NM

for Intervenor-Appellee Coalition for Sustainable Communities New Mexico

**CONSOLIDATED WITH**

**NO. S-1-SC-39558**

**SOUTHWESTERN PUBLIC
SERVICE COMPANY,**

     Appellant,

v.

**NEW MEXICO PUBLIC
REGULATION COMMISSION,**

     Appellee.

**In the Matter of the Commission's
Adoption of Rules Pursuant to the
Community Solar Act, NMPRC
Case No. 21-00112-UT**

**APPEAL FROM THE NEW MEXICO PUBLIC REGULATION
COMMISSION**

Hinkle Shanor, LLP
Dana S. Hardy
Timothy B. Rode
Santa Fe, NM

Erika M. Kane, Lead General Counsel

Austin TX

for Appellant

Russell R. Fisk, Associate General Counsel
Erin E. LeCocq, Special Counsel
Santa Fe, NM

for Appellee

**AND**

**NO. S-1-SC-39611**

**SOUTHWESTERN PUBLIC SERVICE COMPANY,**

      Appellant,

v.

**NEW MEXICO PUBLIC REGULATION COMMISSION,**

      Appellee.

**In the Matter of Implementation and Administration of the Community Solar Program, Case No. 22-00020-UT**

**In the Matter of the Compliance Filing of Southwestern Public Service Company Pursuant to 17.9.573.9 NMAC, Case No. 22-00240-UT**

**In the Matter of the Application of El Paso Electric Company for Approval of Tariffs Necessary for**

**Implementation of the New Mexico
Community Solar Program and
Accounting Order, Case No. 22-00243-UT**

**APPEAL FROM THE NEW MEXICO PUBLIC REGULATION
COMMISSION**

Hinkle Shanor, LLP
Dana S. Hardy
Timothy B. Rode
Santa Fe, NM

Erika M. Kane, Lead General Counsel
Austin TX

for Appellant

Russell R. Fisk, Associate General Counsel
Erin E. LeCocq, Special Counsel
Santa Fe, NM

for Appellee

**AND**

**NO. S-1-SC-39678**

**SOUTHWESTERN PUBLIC
SERVICE COMPANY,**

     Appellant,

v.

**NEW MEXICO PUBLIC
REGULATION COMMISSION,**

     Appellee.

**In the Matter of Implementation and Administration of the Community Solar Program, Case No. 22-00020-UT**

**In the Matter of the Compliance Filing of Southwestern Public Service Company Pursuant to 17.9.573.9 NMAC, Case No. 22-00240-UT**

**In the Matter of the Application of El Paso Electric Company for Approval of Tariffs Necessary for Implementation of the New Mexico Community Solar Program and Accounting Order, Case No. 22-00243-UT**

**APPEAL FROM THE NEW MEXICO PUBLIC REGULATION COMMISSION**

Hinkle Shanor, LLP
Dana S. Hardy
Timothy B. Rode
Santa Fe, NM

Erika M. Kane, Lead General Counsel
Austin TX

for Appellant

Russell R. Fisk, Associate General Counsel
Erin E. LeCocq, Special Counsel
Santa Fe, NM

for Appellee

**OPINION**

**ZAMORA, Justice.**

{1}     In this appeal we decide whether the Community Solar Rule, 17.9.573 NMAC (7/12/2022 as amended through 10/22/2024) (the Rule), is contrary to various provisions of the Community Solar Act (the Act), NMSA 1978, §§ 62-16B-1 to -8 (2021, as amended through 2022), and is therefore "unreasonable or unlawful," NMSA 1978, § 62-11-5 (1982). Among other things, Appellant Southwestern Public Service Company (SPS) and Intervenors Public Service Company of New Mexico (PNM) and El Paso Electric Company (EPE) (the Utilities)[1] challenge the Rule's prohibition against subtracting transmission costs from a utility's community solar bill-credit rate as an unlawful subsidy under the Act. *See* 17.9.573.20(D) NMAC; *see also* § 62-16B-7(B)(8) (setting forth requirements for "a community solar bill credit rate mechanism," including that "non-subscribers shall not subsidize costs attributable to subscribers"). We hold that prohibiting the subtraction of transmission costs from the bill-credit rate is a reasonable exercise of the policy-making authority delegated under the Act to the New Mexico Public Regulation Commission. We

---

[1]Unless otherwise noted, SPS is joined in its substantive challenges to the Rule by PNM and EPE. The City of Las Cruces and four advocacy organizations also intervened and filed an answer brief in support of the Rule and the various orders challenged in this appeal.

therefore affirm the Commission on that issue. *See* § 62-11-5. We similarly hold that the other provisions of the Rule challenged by the Utilities are neither unreasonable nor unlawful, and we affirm the Commission's adoption of the Rule in full. *See id.*

{2}     We also must decide (1) whether the Rule must be vacated and annulled because of possible ex parte communications after the close of the rulemaking record purportedly in violation of statute and due process and (2) whether the Commission violated the statute and due process by rejecting SPS's original, proposed bill-credit rate without a hearing. Answering both questions in the negative, we affirm the Commission's orders challenged in this appeal.

## I.     BACKGROUND

{3}     This consolidated appeal centers on the Commission's efforts to promulgate and enforce rules to implement the Community Solar Act. In brief, the Act provides for the creation and development of community solar facilities, which are subscriber-owned or operated facilities that produce solar-generated electricity, are located within a public utility's service territory, and are interconnected to the utility's distribution system. *See* § 62-16B-2(D) (defining "community solar facility"); § 62-16B-3(A)(2) (setting forth requirements for the location and interconnection of community solar facilities); § 62-16B-4(A) (providing for ownership of community solar facilities). A community solar subscriber receives a credit from the utility on

the subscriber's electric bill, calculated by multiplying a per-kilowatt-hour rate determined by the Commission by up to one hundred percent of the electricity the subscriber consumed. Section 62-16B-2(D); *see also* § 62-16B-2(C) (defining "community solar bill credit rate"); § 62-16B-5(A)(1) (setting forth subscription requirements). The Rule's requirements for establishing the bill-credit rate are the subjects of several challenges in this appeal.

{4}    The Act, which was signed into law in April 2021, mandates an aggressive timeline for promulgating rules to establish a community solar program. S*ee* 2021 N.M. Laws ch. 34, § 7; *see also* § 62-16B-7(B) ("The Commission shall adopt rules to establish a community solar program by no later than April 1, 2022."); *see also* § 62-16B-7(E) (requiring a comprehensive report to "the appropriate interim legislative committee" by November 1, 2024, "on the status of the community solar program, including . . . an evaluation of the effectiveness of the [C]ommission's rules to implement the [Act] and any recommended changes"). The Act also prescribes a detailed list of ten subject areas the eventual rules must address through a broadly inclusive rulemaking process. *See* § 62-16B-7(B); *see also* § 62-16B-7(D) (requiring the Commission to "solicit input from relevant state agencies, public utilities, low-income stakeholders, disproportionately impacted communities, potential owners or operators of community solar facilities, Indian nations, tribes

and pueblos and other interested parties in its rulemaking process").

{5}     In response to the Act's timeline and detailed rulemaking requirements, the Commission opened a rulemaking docket in May 2021 and contracted with a specialized consulting firm to "advise and assist with regard to the . . . rulemaking . . . , including substantive issues such as the content of any rule as well as procedural issues such as facilitating stakeholder engagement in the process." The Commission also announced the formation, "within the Commission, [of] a Community Solar Action Team (the 'Team')," composed of two commissioners and unnamed representatives of the Commission's Utilities Division Staff, Office of General Counsel, and Chief of Staff, "among others." The Team's stated purposes were to "take a leading role in the rulemaking process, [to] interface with [the consultant], and [to] endeavor to maximize stakeholder engagement."

{6}     After five months of soliciting input through workshops and working groups, the Commission filed its Order Issuing Notice of Proposed Rulemaking (the Notice) in late October 2021. The Notice summarized the Commission's informal proceedings, culminating in the consultant's comprehensive status report summarizing stakeholder input and providing recommendations for the proposed rule. The Notice also included the proposed rule itself, which the Commission acknowledged was incomplete due to "insufficient time and insufficient resources

4

to formulate a comprehensive proposed rule in the informal proceedings." Accordingly, the Notice included a list, recommended by the Team, of "Additional Issues to be Addressed in Formal Comment Process."

{7}     After the comment period ended, the Commission issued its Order Adopting the Rule on March 30, 2022, two days before the statutory deadline. *See* § 62-16B-7(B). In addition to providing the text of the final rule, the order summarized the formal comment process and identified the parties who had submitted comments during the comment period, including the Utilities. For each issue raised during the comment period, the order summarized the comments received, provided the Team's recommendations and reasoning for addressing the issue in the final rule, and stated the Commission's decision.

{8}     A spate of motions followed, challenging the Order Adopting the Rule. In response, the Commission issued its Order on Rehearing on May 18, 2022, partially granting five motions for rehearing, reconsideration, and clarification of the Order Adopting the Rule, denying four motions seeking similar relief on other grounds, and partially granting SPS's and EPE's request for procedural clarifications. Relevant here, the Commission denied many of the Utilities' substantive challenges to the Rule. The Commission also rejected the Utilities' argument that the Team's recommendations after the close of the record may have amounted to prohibited ex

parte communications.

{9}     SPS first appealed to this Court from the Order on Rehearing and the Order Adopting the Rule, challenging various provisions of the Rule as contrary to the Act and challenging the Commission's reliance on the Team's recommendations after the close of the record as a violation of statute and due process. PNM and EPE intervened in the appeal and joined SPS's arguments except as noted later in this opinion.

{10}    While SPS's first appeal was pending, it filed its first advice notice with the Commission under the Rule, which included a proposed bill-credit rate that openly excluded transmission costs contrary to Rule 573.20(D). *See* 17.9.573.20(D) NMAC ("The utility shall not subtract any costs of transmission from the solar bill credit rate calculation."). The Commission rejected the bill-credit rate without a hearing, finding that SPS had subtracted transmission costs in "flagrant disregard" of the Rule and ordering SPS to file a compliant rate within two business days. SPS filed a second advice notice under protest, with a bill-credit rate that did not subtract transmission costs, and demanded a hearing on its original proposed bill-credit rate. The Commission again concluded that no hearing was necessary and allowed SPS's revised bill-credit rate to take effect. SPS appealed from both orders, arguing that the denial of its original proposed bill-credit rate violated SPS's statutory and due

process rights.

{11} We consolidated these various appeals, ordered briefing, and heard oral argument. Shortly after the argument, we filed an order upholding the Rule and affirming the Commission's orders challenged in this appeal. *See* Order, S-1-SC-39432 (Mar. 11, 2024). We now issue this opinion to explain our reasoning.

## II. DISCUSSION

{12} We consider this appeal in three sections. In Section II.A, we consider the Utilities' various challenges to the Rule itself, beginning with their challenge to the prohibition against subtracting transmission costs from the bill-credit rate. In Section II.B, we consider whether the Commission engaged in prohibited ex parte communications with the Team after the close of the record in violation of statute and due process. In Section II.C, we address the Commission's refusal to hold a hearing before rejecting SPS's original bill-credit rate or allowing SPS's revised bill-credit rate to take effect. We provide additional background as necessary throughout our analysis.

## A. The Utilities Have Not Met Their Burden to Show the Rule Is Unreasonable or Unlawful

{13} The Utilities challenge the Rule on seven grounds, arguing that it violates various provisions of the Act, is vague and unenforceable, or is arbitrary and capricious. Specifically, the Utilities argue that the Rule (1) creates an unlawful

subsidy by prohibiting the subtraction of transmission costs from the bill-credit rate, (2) creates an unlawful subsidy by allowing interconnection costs to be shared with non-subscribers on a case-by-case basis, (3) violates the prohibition against co-location by allowing co-location of community solar facilities on a case-by-case basis, (4) ignores the Commission's duty to oversee the selection of community solar projects by delegating responsibility to a third-party administrator, (5) ignores the requirement to promulgate interconnection rules specifically for community solar facilities, (6) ignores the requirement to promulgate guidelines for low-income customers, and (7) fails to implement adequate consumer protection standards and enforcement procedures. These are legal questions that we review de novo and that we address in turn. *N.M. Atty. Gen. v. N.M. Pub. Regul. Comm'n*, 2015-NMSC-032, ¶ 24, 359 P.3d 133. As the parties challenging the Rule, the Utilities bear the burden of demonstrating the Rule is unreasonable or unlawful. *See* NMSA 1978, § 62-11-4 (1965).

**1.     The Commission's interpretation of Section 62-16B-7(B)(8) to prohibit subtracting transmission costs from the bill-credit rate is reasonable and within the Commission's policy-making authority**

{14}     The Utilities first challenge the Rule's prohibition against subtracting transmission costs from the bill-credit rate. The Rule provides that "[t]he utility shall not subtract any costs of transmission from the solar bill credit rate calculation."

8

17.9.573.20(D) NMAC. The Utilities argue the prohibition will result in non-subscribers subsidizing transmission "costs attributable to subscribers," in violation of Section 62-16B-7(B)(8), and will exceed the scope of the Act's definition of *community solar bill credit*, which is limited to "the credit value of electricity *generated* by a community solar facility." Section 62-16B-2(B) (emphasis added). The Utilities contend that the Rule's mandate against subtracting transmission costs from the bill-credit rate "is directly contrary to the Act" and amounts to an abuse of discretion.

**a.      Additional background**

{15}      We provide three points of additional background before proceeding with our analysis. First, we take note of the terms *generation* (production), *transmission*, and *distribution* in this context and how they apply to community solar facilities. In general, electricity is *generated* at the production location, *transmitted* over long distances at high voltage, and stepped down to a lower voltage so it can be *distributed* to customers at a local level. *See* 17.9.531.7(F) NMAC ("*Generation* means the production or acquisition of energy supply."); 17.9.531.7(G) NMAC ("*Transmission* means the activities involved in the transmission of electric power from the source or producer of power to the distribution system."); 17.9.531.7(D) NMAC ("*Distribution* means the delivery of electric power from the transmission

system through distribution lines to the meter of the retail customer."). By definition, a community solar facility is a generation source *within* a utility's distribution system that produces additional electricity for the utility and its customers, including both subscribers and non-subscribers. *See* § 62-16B-3(A)(2) (requiring a community solar facility to be interconnected to a utility's distribution system); *see also* § 62-16B-6(A)(1) ("A qualifying utility shall . . . acquire the entire output of a community solar facility connected to its distribution system."). Accordingly, electricity generated by a community solar facility is distributed and consumed locally, without requiring use of a utility's transmission system.

{16}     Second, we note the significance of the bill-credit rate itself, which the Commission's rulemaking consultant described as "a central feature of any community solar program and . . . critical to its success." As the consultant explained,

> A bill credit rate set too low will erode developer interest in pursuing community solar projects and undermine the value proposition for prospective customer-subscribers. The net effect is likely a community solar program in name only; with few, if any, community solar projects developed and customers enjoying little by way of bill savings. Conversely, a bill credit rate set too high can catalyze an "overheated" community solar market, driving difficult interconnection queue issues, consumer protection concerns, and potentially impacting utility revenue collection from the application of credits on Subscribers['] bills.

In practical terms, the bill-credit rate determines the credit that a community solar subscriber will receive from a utility for each kilowatt-hour of electricity consumed, for up to one hundred percent of the subscriber's average annual consumption. *See* § 62-16B-2(C); § 62-16B-5(A)(1). By definition, the bill-credit rate is *less* than the approved rate charged by a utility for each kilowatt-hour of electricity consumed. *See* § 62-16B-7(B)(8) (prescribing the bill-credit rate as the "total aggregate retail rate [(TARR)] . . . , less the [C]ommission-approved distribution cost components"). For example, the approved bill-credit rate challenged by SPS in this appeal will reduce a residential-service subscriber's monthly electricity rate by approximately seventy percent for each kilowatt-hour of electricity eligible for the credit.[2]

{17}     Third, the Act requires the Commission to establish a "mechanism" by rule for calculating the bill-credit rate on a per-customer-class basis. Section 62-16B-7(B)(8). The relevant provision, quoted here in full, mandates the creation of rules that

> provide a community solar bill credit rate mechanism for subscribers derived from the qualifying utility's [TARR] on a per-customer-class basis, less the [C]ommission-approved distribution cost components,

---

[2]The community solar bill credit is distinct from the cost of a community solar subscription, which is paid directly to a community solar subscriber organization. *See* § 62-16B-2(M) (defining *subscriber organization*); § 62-16B-2(N) (defining *subscription*); § 62-16B-6 (setting forth duties of utilities and subscriber organizations in administering a community solar program).

and identify all proposed rules, fees and charges; provided that non-subscribers shall not subsidize costs attributable to subscribers; and provided further that if the [C]ommission determines that it is in the public interest for non-subscribers to subsidize subscribers, non-subscribers shall not be charged more than three percent of the non-subscribers' aggregate retail rate on an annual basis to subsidize subscribers.

*Id.* For purposes of our discussion, this provision has two main components. First, it sets forth a basic formula: the bill-credit rate is "derived from the qualifying utility's [TARR] . . . , less the [C]ommission-approved distribution cost[s]."[3] *Id.* Second, the statute sets forth a proviso to the basic formula: "non-subscribers shall not subsidize costs attributable to subscribers." *Id.*

{18}  How to calculate the bill-credit rate under Section 62-16B-7(B)(8)—and

---

[3]The Act separately defines the TARR, which provides the starting point for calculating the bill-credit rate as

the total amount of a qualifying utility's demand, energy and other charges converted to a kilowatt-hour rate, including fuel and power cost adjustments, the value of renewable energy attributes and other charges of a qualifying utility's effective rate schedule applicable to a given customer rate class, but does not include charges described on a qualifying utility's rate schedule as minimum monthly charges, including customer or service availability charges, energy efficiency program riders or other charges not related to a qualifying utility's power production, transmission or distribution functions, as approved by the [C]ommission, franchise fees and tax charges on utility bills.

Section 62-16B-2(O).

specifically whether transmission costs should be subtracted from the TARR—was, according to the Team, "perhaps the point of greatest contention between utilities, on the one hand, and subscriber organizations and other commenters, on the other hand." For its part, SPS insisted that including transmission costs in the bill-credit rate would "result in an unrecognized subsidy of community solar by non-subscribers," in violation of the statute's proviso. *Id.* However, both the Team and the Commission were persuaded that "the express exclusion of distribution costs from the credit [in the basic formula] renders the Legislature's silence on transmission costs a clearly intentional omission, and thus, indicates an intent not to exclude transmission costs." The final version of the Rule therefore prohibits subtracting (excluding) transmission costs from the bill-credit rate. *See* 17.9.573.20(D) NMAC. Later in the proceedings, the Commission elaborated on its reasons for the prohibition, explaining that its view of legislative intent is "consistent with the Commission's understanding of community solar projects." In the Commission's view, "It is difficult . . . to conceive of any situation in which transmission costs might reasonably be considered to have been caused by a community solar project. On the contrary, community solar projects bring generation within the distribution level of the grid."

**b.    Discussion**

{19}    We must decide whether the Commission's interpretation of Section 62-16B-7(B)(8) as prohibiting subtracting transmission costs from the bill-credit rate is contrary to the Act. We are not bound by the Commission's interpretation of a statute and "may substitute (our) own judgment for that of the agency" because "[i]t is the function of the courts to interpret the law." *Doña Ana Mut. Domestic Water Consumers Ass'n v. N.M. Pub. Regul. Comm'n*, 2006-NMSC-032, ¶ 10, 140 N.M. 6, 139 P.3d 166 (internal quotation marks and citation omitted). In certain circumstances, however,

> [w]e are . . . more likely to defer to an agency interpretation if the relevant statute is unclear or ambiguous, the legal questions presented implicate special agency expertise or the determination of fundamental policies within the scope of the agency's statutory function, and it appears that the agency has been delegated policy-making authority in the area.

*Id.* (internal quotation marks and citations omitted). When these circumstances are present, we will defer to "the agency's interpretation of a law [unless it] is unreasonable or unlawful." *Morningstar Water Users Ass'n v. N.M. Pub. Util. Comm'n*, 1995-NMSC-062, ¶ 11, 120 N.M. 579, 904 P.2d 28; *see also Gila Res. Info. Project v. N.M. Water Quality Control Comm'n*, 2018-NMSC-025, ¶ 35, 417 P.3d 369 ("We will overturn the administrative construction of statutes by appropriate agencies *only if they are clearly incorrect*." (internal quotation marks

14

and citation omitted)). For the reasons that follow, we defer to the Commission's interpretation of Section 62-16B-7(B)(8).

{20} To start, the statute's meaning is ambiguous and "reasonably subject to multiple interpretations." *See State v. Almanzar*, 2014-NMSC-001, ¶ 15, 316 P.3d 183. While the basic formula for calculating the bill-credit rate is clear and undisputed, the proviso's language—"provided that non-subscribers shall not subsidize costs attributable to subscribers," § 62-16B-7(B)(8)—"does not lend itself well to judicial construction" when several of its key terms are undefined and "general enough . . . to have a variety of meanings." *Doña Ana*, 2006-NMSC-032, ¶ 15 (holding that the phrase "'unreasonably interfere with the service or system' of a utility" was ambiguous when *interfere* and *service or system* were undefined).

{21} For instance, the Act does not define *subsidize* or prescribe how to determine whether the bill-credit rate could result in a subsidy by non-subscribers, whose electricity bills are not directly affected by the bill-credit rate. *Cf.* § 62-16B-6(A)(2) ("A qualifying utility shall . . . apply community solar bill credits to *subscriber* bills . . . ." (emphasis added)). Similarly, the Act does not define *costs* or identify the types of costs that may be subject to the proviso prohibiting subsidization. Notably, the only costs identified in Section 62-16B-7(B)(8) are the "distribution cost components" that must be subtracted from the TARR, *see id.*, and the "fuel and

power cost adjustments" incorporated by reference from the definition of the TARR itself, § 62-16B-2(O). Whether the proviso applies to these identified costs or only to these costs or to other, unnamed costs is unclear. Nor does the Act define the phrase *attributable to subscribers*, including whether it refers to subscribers as generic ratepayers or specifically as a result of their subscription. When the Legislature has left such questions open to reasonable interpretation, the statute is ambiguous. *See Doña Ana*, 2006-NMSC-032, ¶ 15.

{22}     In addition, Section 62-16B-7(B)(8) addresses the Commission's regulatory authority, justifying our deference to the Commission's interpretation. The statute implicates the Commission's specialized expertise, namely regulating public utilities and setting "fair, just, and reasonable rates." NMSA 1978, § 62-3-1(B) (2008); *see also, e.g.*, *Doña Ana*, 2006-NMSC-032, ¶ 16 (describing "a comprehensive regulatory scheme granting the [Commission] the policy-making authority to plan and coordinate the activities of New Mexico public utilities, in a manner consistent with the Legislature's stated goals"). The statute also delegates responsibility to the Commission for adopting a rule to "provide a community solar bill credit rate mechanism for subscribers." Section 62-16B-7(B)(8). This delegation necessarily includes the policy-making authority to promulgate a rule consistent with the purposes of the Act and the Commission's expertise. *See* NMSA 1978, § 62-19-9(A)

16

(2020) ("The [C]ommission shall administer and enforce the laws with which it is charged and has every power conferred by law."). Given the Legislature's express delegation of authority to effectuate the ambiguous requirements of Section 62-16B-7(B)(8), "[t]he Commission is the appropriate policy-making entity in this context." *Gila Res. Info. Project*, 2018-NMSC-025, ¶ 36.

{23} We therefore defer to the Commission's interpretation of Section 62-16B-7(B)(8) unless it is unreasonable or unlawful. *Morningstar Water Users Ass'n*, 1995-NMSC-062, ¶ 11. It is neither. The Commission concluded that the Legislature intended transmission costs *not* to be subtracted from the TARR when determining the bill-credit rate given (1) the statute's clear, exclusive mandate to subtract *distribution* costs from the TARR and (2) the absence of any reference to transmission costs in the statute. We have applied this reasoning before, albeit in different contexts. *See State v. Nick R.*, 2009-NMSC-050, ¶¶ 16, 23, 147 N.M. 182, 218 P.3d 868 (holding that the Legislature's inclusion of the specific term "switchblade" in the definition of "deadly weapon" showed an intent not to include "all pocketknives" in the definition); *see also City of Santa Rosa v. Jaramillo*, 1973-NMSC-119, ¶¶ 9-11, 85 N.M. 747, 517 P.2d 69 (holding that the Legislature's inclusion of two exceptions to the prohibition against transferring liquor licenses signaled an intent not to permit other exceptions). Consistent with our reasoning in

17

those cases, the explicit mandate to subtract distribution costs from the TARR—with no mention of transmission costs—is highly persuasive of the Legislature's intent not to subtract transmission costs from the TARR.

{24}     This reading of the statute is also supported by the Commission's explanation that community solar projects "bring generation within the distribution level of the grid" and therefore do not result in transmission costs. *See* § 62-16B-3(A)(2) (providing that a community solar facility must be interconnected to a utility's distribution system). The Commission could reasonably conclude that if a community solar project does not result in transmission costs, then such a project does not introduce transmission costs that are *attributable to subscribers* and subject to the prohibition against subsidization. *See* § 62-16B-7(B)(8). The Utilities advance a different reading of the statute under which transmission costs are shared among all ratepayers, such that crediting subscribers for their transmission costs will necessarily result in a subsidy by non-subscribers. While that may be a plausible interpretation of the statute, we defer to the Commission's reasonable interpretation as the entity delegated policy-making authority under the Act.

{25}     As a final matter, we are not persuaded by the Utilities' argument that the Act's definition of *community solar bill credit* requires a different result. *See* § 62-16B-2(B). The Utilities argue that because the Act defines the bill credit as "the

18

credit value of electricity *generated* by a community solar facility," the bill-credit *rate* must not include any costs unassociated with the costs of generation. *Id.* (emphasis added). Again, the Utilities' preferred reading of Section 62-16B-2(B) is not the only permissible reading of that provision.[4] And importantly, the Utilities' interpretation would render other provisions of the Act surplusage. If the bill credit were limited to the cost of generation, it would be unnecessary to prescribe in detail how to calculate the TARR and then to mandate the subtraction of distribution costs. *See* § 62-16B-2(O) (defining the TARR); § 62-16B-7(B)(8). We decline to read Section 62-16B-2(B) in a manner that would impermissibly render these other provisions unnecessary. *See, e.g.*, *State v. Hobbs*, 2022-NMSC-018, ¶ 23, 518 P.3d 489 The Commission's interpretation of Section 62-16B-7(B)(8) is reasonable, lawful, and within the scope of the policy-making authority delegated by the Legislature under the Act.

---

[4]For instance, one could reasonably emphasize "the credit *value* of electricity generated by a community solar facility," § 62-16B-2(B), an interpretation that would consider all of the costs and benefits that result from electricity generated by a community solar facility, not merely the cost of generation. This reading of the statute would readily support the Commission's interpretation of Section 62-16B-7(B)(8).

**2. The Commission's interpretation of Section 62-16B-7(B)(6) to allow the sharing of interconnection costs on a case-by-case basis is reasonable and within the Commission's policy-making authority**

{26}   The Utilities next challenge Rule 573.13(A), which provides that "[t]he [C]ommission may determine on a case-by-case basis whether the cost of distribution system upgrades necessary to interconnect one or more community solar facilities may be eligible for some form of cost-sharing" among ratepayers, including both subscribers and non-subscribers. 17.9.573.13(A)(2) NMAC. The Utilities argue that *any* sharing of interconnection costs with non-subscribers necessarily results in subsidization, in violation of Section 62-16B-7(B)(6). That provision requires the Commission, in relevant part, to adopt rules that "establish . . . standards, fees, and processes for the interconnection of community solar facilities . . . , such that a qualifying utility and its non-subscrib[ers] do not subsidize the costs attributable to the subscriber organization under this paragraph." *Id.* In the Utilities' view, subsidization and cost sharing are synonymous, so the Commission erred by allowing the potential for any interconnection costs to be shared with non-subscribers.

{27}   In response, the Commission argues that the Rule does not violate Section 62-16B-7(B)(6) because cost sharing with non-subscribers may be permitted only when subsidization would *not* occur. According to the Commission, a subscriber

20

organization requesting cost sharing must demonstrate under Rule 573.13(C) that "the costs borne by [non-subscribing] ratepayers are matched or exceeded by demonstrable benefits to such ratepayers, *so that there will be no subsidization of interconnection costs by nonsubscribing ratepayers* in appropriate cases." 17.9.573.13(C) NMAC (emphasis added). The Commission also points to the Rule's standards for evaluating the public benefit of a "cost-sharing mechanism," which are derived from the existing statutory standards for "considering cost sharing or rate basing grid modernization projects." 17.9.573.13(B) NMAC; *see* NMSA 1978, § 62-8-13 (2021) (setting forth requirements for a public utility to apply for "grid modernization projects"). The Commission argues that allowing cost sharing in these limited circumstances may be necessary when, for example, interconnection costs would otherwise be prohibitive to a subscriber organization.[5] The Commission states that this flexible approach balances its duty to adopt rules that satisfy Section 62-16B-(7)(B)(6) and that "reasonably allow for the creation, financing and accessibility of community solar facilities." Section 62-16B-7(B)(9).

---

[5]This argument is consistent with the Team's recommendation about sharing interconnection costs, in which it warned that "some, perhaps many, [community solar] projects will be met with prohibitive interconnection costs involving upgrades to the system that would benefit other projects and non-subscribing ratepayers. Cost sharing could well be the critical factor determining the feasibility of many projects."

{28} The Utilities' argument again requires us to consider whether the Commission's interpretation of a statute—this time, the prohibition against subsidization set forth in Section 62-16B-7(B)(6)—is worthy of deference. As a threshold matter, we hold that Section 62-16B-7(B)(6) is ambiguous and concerns substantive issues within the Commission's policy-making authority and expertise. *See Doña Ana*, 2006-NMSC-032, ¶ 10 (describing circumstances when the Court is likely to defer to the Commission's interpretation of a statute). The statute's meaning is ambiguous when the Act neither defines the term *subsidize* nor prescribes how to ensure that "a qualifying utility and its non-subscrib[ers] do not subsidize the costs attributable to the subscriber organization." Section 62-16B-7(B)(6). And by requiring rules that establish "standards, fees, and processes for the interconnection of community solar facilities," the Legislature has tasked the Commission with interpreting Section 62-16B-7(B)(6) in a manner that balances the various interests at stake. *See Gila Res. Info. Project*, 2018-NMSC-025, ¶ 34. This task falls squarely within the Commission's expertise. *See, e.g.*, *S.W. Pub. Serv. Co. v. N.M. Pub. Regul. Comm'n*, 2024-NMSC-012, ¶ 40, 548 P.3d 97 (describing the Commission's "overarching duty to regulate public utilities in a manner that balances the interests of the public, consumers, and investors to ensure that reasonable and proper services shall be available at fair, just and reasonable rates" (internal quotation marks and

22

citation omitted)).

{29} We therefore will defer to the Commission unless we agree with the Utilities that the Commission's interpretation of Section 62-16B-7(B)(6) "is unreasonable or unlawful." *See Morningstar Water Users Ass'n*, 1995-NMSC-062, ¶ 11. As previously noted, the Utilities argue that the Act's prohibition of subsidization applies to cost sharing with equal force. We disagree that the statute's meaning is so clear when the Act provides no guidance about the form or substance that a prohibited subsidy may—or must—take. The term *subsidize* certainly does not forbid consideration of both the costs and benefits of interconnection upgrades when evaluating whether "some form of cost-sharing . . . among all rate payers" may be permitted without violating the prohibition against subsidization. 17.9.573.13(A)(2) NMAC.

{30} Moreover, the Utilities cite no authority that would require their preferred reading of the statute, particularly when the Rule limits cost sharing to circumstances when there will be *no* subsidization because of the off-setting benefit to all ratepayers of the resulting system upgrades. We defer to the Commission's interpretation of Section 62-16B-7(B)(6) to allow cost sharing in appropriate circumstances as a reasonable balancing of the interests of community solar facilities, subscribers, non-subscribers, and utilities, in accordance with the authority delegated under the Act.

*See New Energy Econ., Inc. v. N.M. Pub. Regul. Comm'n*, 2018-NMSC-024, ¶ 25, 416 P.3d 277 ("[I]f it is clear that our Legislature delegated to the [Commission] (either explicitly or implicitly) the task of giving meaning to interpretive gaps in a statute, we will defer to the [Commission]'s construction of the statute as the [Commission] has been delegated policy-making authority and possesses the expertise necessary to make sound policy.").

**3.    The Commission's interpretation of the Act's prohibition against the co-location of community solar facilities is reasonable and within the Commission's policy-making authority**

{31}    The Utilities next argue the Rule unlawfully allows co-location of community solar facilities, in violation of two provisions of the Act that expressly prohibit co-location. *See* § 62-16B-3(A)(4) ("A community solar facility shall . . . have the option to be co-located with other energy resources, *but shall not be co-located with other community solar facilities*." (emphasis added)); § 62-16B-7(B)(10) ("The rules shall . . . provide requirements for the siting and co-location of community solar facilities with other energy resources; *provided that community solar facilities shall not be co-located with other community solar facilities*." (emphasis added)). The Utilities challenge Rule 573.18, which provides as follows:

> As long as a community solar facility is not located on the same parcel as another community solar facility, it shall not be considered co-located with another community solar facility. For any parcel that has been subdivided in the two years prior to a community solar project bid,

24

all subdivided parcels shall be considered a single parcel for the purposes of this rule. The [C]ommission will consider, on a case-by-case basis, allowing more than one community solar facility to be located on the same parcel.

17.9.573.18 NMAC. According to the Utilities, this provision defines *co-location* as being located on the same parcel of land and then violates the Act by permitting the Commission to "consider, on a case-by-case basis, allowing more than one community solar facility to be located on the same parcel." 17.9.573.18 NMAC. The Utilities argue the Commission lacks "authority to create this type of *ad hoc* exception" to the prohibition against the co-location of community solar facilities.

{32}    We agree with the Commission that the prohibition against co-location is ambiguous because the Act neither defines *co-locate* nor provides a reason for the prohibition. *See* §§ 62-16B-3(A)(4), -7(B)(10). The Utilities contend, however, that the term *co-locate* is not ambiguous and that its plain meaning dictates a one-facility-per-parcel definition. That assertion certainly does not follow from the Utilities' only cited authority: a common dictionary that defines the term *colocate* to mean, "to locate (two or more things) together or be located together." *See colocate*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/colocate (last visited Jan. 6, 2025). The Utilities make no attempt to explain how being "located together" necessarily means being "located together [*on the same parcel*]." *Id.* Nor does any provision of the Act or the Rule require the prohibition against co-location

25

to be enforced on a per-parcel basis. Thus, we are faced again with an ambiguous statutory term that requires the Commission to exercise its policy-making authority and apply its specialized expertise to carry out its statutory duties. *See* § 62-16B-7(B)(10) (requiring the Commission to adopt rules that "provide requirements for the siting and co-location of community solar facilities with other energy resources; provided that community solar facilities shall not be co-located with other community solar facilities").

{33} The Commission's exercise of that authority was reasonable. Rather than adopting a rigid definition of *co-locate*, the Commission opted for a flexible approach to determining whether community solar facilities are co-located. First, the Commission established a categorical rule that facilities that are not on the same parcel are *not* co-located. *See* 17.9.573.18 NMAC. This categorical rule, which we presume is lawful, has not been challenged on appeal.[6] *See, e.g.*, *Tenneco Oil Co. v. N.M. Water Quality Control Comm'n*, 1987-NMCA-153, ¶ 14, 107 N.M. 469, 760 P.2d 161 ("Rules and regulations enacted by an agency are presumed valid and will

---

[6]Although we defer to the Commission's interpretation of the Act on this issue, we also note that the failure to challenge the location of community solar facilities consistent with this presumption is fatal to the Utilities' pre-enforcement challenge. *See, e.g.*, *Gila Res. Info. Project*, 2018-NMSC-025, ¶ 6 ("Petitioners must establish that no set of circumstances exist where the . . . [r]ule could be valid.").

be upheld if reasonably consistent with the statutes that they implement."), *superseded by statute on other grounds as stated in N.M. Mining Ass'n v. N.M. Water Quality Control Comm'n*, 2007-NMCA-010, ¶ 19, 141 N.M. 41, 150 P.3d 991.

{34} Second, the Commission opted to consider on a case-by-case basis whether two or more facilities may be located on the same parcel without violating the prohibition against co-location. *See* 17.9.573.18 NMAC. Relevant to this inquiry, the Commission found during the rulemaking that the reason for the prohibition is to avoid gaming by developers who would evade the Act's five-megawatt limit for a single community solar facility by subdividing a parcel to locate multiple facilities in close proximity. *See* § 62-16B-3(A)(1) (providing that a community solar facility shall "have a nameplate capacity rating of five megawatts alternating current or less"). This finding is similarly unchallenged on appeal and will guide the Commission in deciding whether more than one community solar facility may be located on the same parcel without violating the prohibition against co-location. *Cf.* 17.9.573.18 NMAC ("For any parcel that has been subdivided in the two years prior to a community solar project bid, all subdivided parcels shall be considered a single parcel for the purposes of this rule."). We defer to the Commission's reasonable interpretation of the Act based on its specialized expertise. *See, e.g.*, *New Energy Econ.*, 2018-NMSC-024, ¶ 25.

**4. The Commission's delegation of responsibility to a third-party administrator to oversee the selection process for community solar projects is not unreasonable or unlawful**

{35} SPS challenges the Rule's delegation of responsibility to a third-party administrator "for selection of proposed projects for building and operating community solar facilities" and the Rule's detailed rubric for the administrator to follow when scoring and selecting bids.[7] *See* 17.9.573.12 NMAC. SPS takes issue mainly with the Rule's disclaimer that "[t]he [C]ommission will have no involvement in the process except to the extent that the administrator or any participant in the process may raise before the [C]ommission an issue that is not fully addressed in this rule and that the [C]ommission finds, in its discretion, that it should address." 17.9.573.12(A) NMAC. SPS argues that the "wholesale delegation of all aspects of the selection of projects" violates the Act's mandate, which requires the *Commission* to "establish a process for the selection of community solar facility projects," § 62-16B-7(B)(4). In SPS's view, this language does not allow the Commission to delegate the administration of the selection process to a third party.

{36} We disagree. Although the Act itself does not authorize the Commission to delegate the administration of the selection process, the Commission has broad

_____

[7]PNM and EPE do not join SPS on this issue.

28

authority to "enter into contracts to carry out its powers and duties." Section 62-19-9(B)(9); *see also* § 62-19-19(A) (authorizing the Commission's Chief of Staff to "hire on a temporary, term or contract basis such other experts or staff as the [C]ommission requires for a particular case" (NMSA 1978, § 62-19-11(A) (2020) (establishing the Commission's Chief of Staff)); *Qwest Corp. v. N.M. Pub. Regul. Comm'n*, 2006-NMSC-042, ¶ 58, 140 N.M. 440, 143 P.3d 478 (discussing responsibilities that may be delegated to advisory staff hired on "temporary, term, or contract employment relationships with the [Commission]"). Here, the Commission's relevant duties are to "administer and enforce the rules and provisions of the . . . Act" and to promulgate rules that "establish a process for the selection of community solar facility projects." Section 62-16B-7(A), (B)(4). The Commission carried out these duties by first prescribing a detailed selection process by rule and then "engag[ing] a third-party administrator to manage" that process, 17.9.573.12(A) NMAC, in accordance with the Commission's authority under Section 62-19-9(B)(9).

{37}	SPS's arguments to the contrary are overstated and unavailing. First, SPS argues that the Act does not authorize the Commission to "abdicate its duties to a third party." This assertion does not withstand scrutiny. The Commission has prescribed a detailed, transparent process for the selection of community solar

facility projects and hired a third-party administrator to manage that process. To guide the administrator, the Rule includes detailed minimum eligibility requirements for bids that will be considered, *see* 17.9.573.12(B)(1)-(5) NMAC, criteria for scoring and awarding points to eligible bids, 17.9.573.12(E)(1)-(9) NMAC, and instructions for establishing wait lists of eligible projects in each utility's territory, 17.9.573.12(H) NMAC. SPS cites no legal authority to support its argument that the Rule's guidance is insufficient or that the Commission may not contract with a third-party administrator to implement this detailed, transparent selection process. We therefore assume no such authority exists.[8] *See, e.g.*, *State v. Veleta*, 2023-NMSC-024, ¶ 39, 538 P.3d 51 ("[W]here [the party] has not provided authority to support his position, we may assume no such authority exists.").

{38}     Second, SPS argues that the Commission exceeded its delegation authority by authorizing the "third-party administrator to make important policy decisions regarding the selection of community solar facility projects." But SPS cites no

_____

[8]We also agree with the Commission and Intervenors-Appellees that this argument contradicts SPS's position during the rulemaking. The Commission requested input during the rulemaking about whether the selection process should be overseen by the Commission's internal staff, a third party, or the Utilities themselves. SPS favored delegation, "strongly preferr[ing] that the utilities manage the process of solicitation of projects." SPS's argument on appeal that the Act does not permit delegation of the selection process therefore rings hollow.

30

authority that (1) proscribes the Commission from delegating "important" policy decisions, or more importantly (2) distinguishes "important" decisions, which assertedly may *not* be delegated, from "[un]important" decisions, which implicitly *may* be delegated. Nor does SPS explain how its lone example of an important decision—the administrator's discretion to award up to five points for an innovative proposal—amounts to a policy decision at all. *See* 17.9.523.12(E)(9) NMAC. We decline to reach these unsupported arguments. *See Veleta*, 2023-NMSC-024, ¶ 39.

{39}     Third, SPS challenges the provision that allows the administrator to award up to five points for an innovative proposal as void for vagueness. *See* 17.9.523.12(E)(9) NMAC. This argument may be readily answered in the context of a pre-enforcement challenge to a regulation that does not implicate constitutionally protected conduct: "A court . . . may sustain a vagueness challenge only if the law 'is impermissibly vague in all of its applications.'" *N.M. Petroleum Marketers Ass'n v. N.M. Env't. Improvement Bd.*, 2007-NMCA-060, ¶ 16, 141 N.M. 678, 160 P.3d 587 (quoting *Vill. of Hoffman Ests. v. The Flipside*, *Hoffman Ests.*, *Inc.*, 455 U.S. 489, 495 (1982)). That standard is not met here. The Rule allows the administrator to award up to five points for a proposal that "includes an innovative commitment or provision beneficial to the local community, to potential subscribers, or to the program overall." 17.9.573.12(E)(9) NMAC. While the words "innovative" and

31

"beneficial" carry a certain amount of subjectivity, they do not "confer whimsical discretion" upon the third-party administrator or otherwise require "persons of common intelligence [to] guess at [their] meaning[s]." *Old Abe Co. v. N.M. Mining Comm'n*, 1995-NMCA-134, ¶¶ 25, 32, 121 N.M. 83, 908 P.2d 776 (internal quotation marks and citation omitted) (upholding a regulation against a void-for-vagueness facial challenge when it did not "confer whimsical discretion" on the director or impose a "criminal or civil penalty for guessing incorrectly" about the regulation's meaning).

{40}     Fourth, SPS argues, quoting 17.9.573.12(F) NMAC, that the Rule provides too much discretion to the administrator by allowing bids to be scored by unidentified "'selection criteria within each qualifying utility's territory.'" This argument relies on a misreading of the Rule. Taken in context, the language challenged by SPS refers not to unidentified selection criteria but to the detailed criteria set forth in the Rule itself. *Id.* ("The program administrator shall select projects *based upon these qualifications and selection criteria* within each qualifying utility's territory until the allocated capacity cap for each utility has been reached." (emphasis added)). The Rule's meaning about the *qualifications* and *criteria* that will be used to select projects is sufficiently clear to provide notice to "a hypothetical recipient desirous of actually being informed," which is sufficient to

satisfy due process. *See S.W. Pub. Serv. Co.*, 2024-NMSC-012, ¶ 48 (internal quotation marks and citation omitted).

{41}     Finally, SPS argues that the Rule is void for vagueness because it fails to provide a right to seek review of the third-party administrator's actions. This argument lacks merit. The right to seek review has no particular significance to whether a provision is void for vagueness; rather, it provides an important check on whether a delegation of authority is permissible at all. "An important aspect of gauging the delegation of discretion is whether the discretion is reviewable." *See, e.g., Old Abe Co.*, 1995-NMCA-134, ¶ 34. Moreover, the Rule expressly allows "the administrator or any participant in the process [to] raise before the [C]ommission an issue that is not fully addressed in this rule." 17.9.573.12(A) NMAC. Given this explicit right of review, SPS's pre-enforcement challenge must fail. *See Gila Res. Info. Project*, 2018-NMSC-025, ¶ 6 (explaining that a challenge to the validity of a rule not yet applied must establish that no set of circumstances exist where the [rule] could be valid").

**5.     The Utilities' remaining challenges to the Rule lack merit**

{42}     The Utilities' remaining challenges to the Rule lack merit, and we therefore treat them summarily.

**a.     The Commission's reliance on its existing interconnection rules does not violate Section 62-16B-7(B)(6)**

{43}     The Utilities argue that the Rule is unlawful because it omits standards for the recovery of a utility's costs resulting from the interconnection of community solar facilities, purportedly in violation of Section 62-16B-7(B)(6). We disagree. The Rule requires the Commission to adopt rules that establish "standards, fees and processes for the interconnection of community solar facilities that are consistent with the [C]ommission's *existing interconnection rules and interconnection manual* that allows a qualifying utility to recover . . . interconnection costs for each community solar facility." Section 62-16B-7(B)(6) (emphasis added). While the Utilities are correct that the Rule does not establish *new* interconnection rules specific to community solar facilities, they ignore that the Commission clarified in its Order on Rehearing that the recovery of interconnection costs would be governed by its *existing* interconnection rules. *See* 17.9.568 NMAC (10/15/2008, repealed and replaced effective 2/14/2023) (interconnection rules for facilities producing up to ten megawatts of electricity). The Utilities neither argue nor explain why the Commission's existing interconnection rules are inadequate for community solar facilities. Nor do the Utilities cite authority requiring the Commission to promulgate duplicative interconnection rules for community solar facilities after a determination that its existing interconnection rules are sufficient. We therefore assume no such authority exists and decline to consider this argument any further. *See Veleta*, 2023-

34

NMSC-024, ¶ 39.

**b.     The Rule does not violate the requirement to promulgate guidelines for serving low-income customers**

{44}     The Utilities next argue the Rule unlawfully ignores the statutory requirement to issue guidelines to achieve an annual thirty-percent "carve-out" of available capacity from community solar facilities for serving low-income customers. *See* § 62-16B-7(B)(3). Rather than including guidelines, the Utilities argue that the Rule "merely parrots the Act by stating that the Commission 'will issue guidelines' at some unknown time in the future." According to the Utilities, the omission of guidelines from the Rule itself "renders the Rule defective."

{45}     We are unpersuaded. The requirement to issue guidelines arises under Section 62-16B-7(B)(3), which mandates the adoption of rules that require a thirty-percent carve-out for low-income customers. The Rule meets this requirement explicitly. *See* 17.9.573.10(B) NMAC ("At least thirty percent of electricity produced from each community solar facility shall be reserved for low-income subscribers and low-income service organizations."). Section 62-16B-7(B)(3) also provides as follows: "The Commission shall issue guidelines to ensure the carve-out is achieved each year and develop a list of low-income service organizations and programs that may pre-qualify low-income customers." The Commission opted to include the required list of service organizations and programs in the Rule itself. *See* 17.9.573.15(A)

35

NMAC (listing low-income service organizations and programs that may pre-qualify low-income customers to be eligible for the carve-out); *see also* 17.9.573.15(B), (C) NMAC (providing "other ways for households and low-income service organizations to qualify" for eligibility as low-income subscribers). The Commission also chose to issue the guidelines separately, at an unidentified time in the future. *See* 17.9.573.10(B) NMAC ("The [C]ommission will issue guidelines to ensure the carve-out is achieved each year."). The Utilities do not argue or explain why the guidelines must be included in the Rule itself or cite authority to support their argument that "sever[ing]" guidelines from the Rule renders it unlawful. In the absence of such argument or authority, we reject this argument without further discussion. *See Veleta*, 2023-NMSC-024, ¶ 39.

**c.     The Rule's consumer protections are not inadequate under Section 62-16B-7(B)(7)**

{46}     For their final challenge to the Rule, the Utilities argue that the Rule is unlawful because it lacks "specific consumer protection standards and establishes no consumer protection enforcement procedures," as required by Section 62-16B-7(B)(7) ("The rules shall . . . provide consumer protections for subscribers, including a uniform disclosure form that identifies the information that shall be provided by a subscriber organization to a potential subscriber . . . as well as grievance and enforcement procedures."). This argument is meritless. The Act requires the

36

Commission to provide only two specific subscriber-protection measures: (1) a uniform disclosure form and (2) grievance and enforcement procedures. *See id.* The Commission has fulfilled both requirements. *See* Subscriber Information Disclosure Form (attached as Exhibit B to order adopting rule); 17.9.573.17(C) NMAC (providing that complaints may be filed with the Commission's consumer relations division and referred to the Attorney General as appropriate). Further, the Utilities ignore that the Rule includes other consumer protection measures, including requirements for subscriber organizations to maintain minimum levels of general liability insurance, *see* 17.9.573.16(B) NMAC, and to develop and implement written subscriber agreements that comply with a detailed list of minimum terms and conditions for subscribing to a community solar project, 17.9.573.17(A) NMAC. The latter measures exceed the minimum requirements set forth in Section 62-16B-7(B)(7). The Utilities have not identified any specific protections that are missing from the Rule and have not explained the inadequacy of an informal process of referral to consumer relations for most subscriber complaints when serious matters may be referred to the Attorney General. *See* 17.9.573.17(C) NMAC. The Utilities thus fail to meet their burden to demonstrate that the Rule is unreasonable or unlawful.

**B. The Utilities Have Not Demonstrated That the Commission's Reliance on Recommendations from the Team Was Unreasonable, Unlawful, or a Violation of Due Process**

{47} In addition to their substantive challenges to the Rule, the Utilities argue that the Order Adopting the Rule must be vacated and annulled because of the Commission's reliance on the Team's purportedly "nonpublic, non-record recommendations" throughout the rulemaking, including after the close of the record. The Utilities argue that the Team's participation requires vacating and annulling the Rule as a violation of their right to due process and of the statutory prohibition against ex parte communications. We address these arguments in turn.

**1. The Commission's reliance on the Team's recommendations does not implicate due process**

{48} First, the Utilities argue "reliance on the Team's undisclosed recommendations" violated due process by depriving the Utilities of notice and "any opportunity to respond on the record to the Team's recommendations before the record closed." This argument is misplaced. Any right in a rulemaking to notice and an opportunity to be heard is statutory and does not result from the constitutional guarantee of due process. *See Livingston v. Ewing*, 1982-NMSC-110, ¶ 14, 98 N.M. 685, 652 P.2d 235 ("There is no fundamental right to notice and hearing before the adoption of a rule; such a right is statutory only." (citing, among others, *Bi-Metallic Co. v. Colorado*, 239 U.S. 441, 445 (1915)) ("The [answer to the] question, . . .

38

whether all individuals have a constitutional right to be heard, before a matter can be decided in which all are equally concerned, . . , was that it was hard to believe that the proposition was seriously made.").

{49} The two cases cited by the Utilities do not hold to the contrary. The first case arose in the context of an adjudication and is therefore inapposite. *See TW Telecom of N.M., LLC v. N.M. Pub. Regul. Comm'n*, 2011-NMSC-029, ¶ 7, 150 N.M. 12, 256 P.3d 24 ("The [Commission] determined that the . . . case would be conducted as an adjudicated case and all interested parties would be given an opportunity to participate . . . ."). Unlike a rulemaking, an adjudicatory proceeding may deprive an individual of a protected liberty or property interest and therefore must satisfy constitutional due process. *See, e.g.*, *Mills v. N.M. State Bd. of Psych. Exam'rs*, 1997-NMSC-028, ¶ 14, 123 N.M. 421, 941 P.2d 502 ("The Fourteenth Amendment protects citizens from deprivations of liberty and property without due process of law."); *see also Miles v. Bd. of Cnty. Comm'rs of Cnty. of Sandoval*, 1998-NMCA-118, ¶ 8, 125 N.M. 608, 964 P.2d 169 (discussing the difference between "individualized [fact-based] deprivations, that are protected by procedural due process, and policy-based deprivations of the interests of a class, that are not protected by procedural due process" (alteration in original) (internal quotation marks and citation omitted)).

{50} While the second case cited by the Utilities arose in the relevant context of a rulemaking, the discussion of due process was unnecessary to our holding. *See Rivas v. Bd. of Cosmetologists*, 1984-NMSC-076, ¶ 13, 101 N.M. 592, 686 P.2d 934 (holding that the repeal of a regulation was invalid when the board "failed to . . . comply with the repeal procedure *of the statute* in failing to give notice to interested parties and to hold a hearing prior to taking action" (emphasis added)). Moreover, the suggestion in *Rivas* that due process may apply in a rulemaking relied on persuasive authority construing the right to notice and comment under statute, NMSA 1978, § 12-8-4 (1969), not due process. *See Rivas*, 1984-NMSC-076, ¶¶ 8, 9 ("Case law suggests . . . 'the minimum protections upon which administrative action may be based.'" (quoting *Mobil Oil Corp. v. Fed. Power Comm'n*, 483 F.2d 1238, 1253 (D.C. Cir. 1973) (discussing the "minimum protections" in informal rulemaking proceedings under the Administrative Procedure Act, 5 U.S.C. § 553 (1970))). Neither *TW Telecom* nor *Rivas* supports the Utilities' argument that due process was violated—much less implicated—in the rulemaking in this case.

{51} The Utilities cite a final case, *Santa Fe Exploration Co. v. Oil Conservation Comm'n*, 1992-NMSC-044, 114 N.M. 103, 835 P.2d 819, in support of a second claimed due-process violation. They argue that the Commission violated due process "[b]y failing to clarify the identity of all Team members, . . . [thereby] depriv[ing]

40

the Utilities of their right to raise possible defenses arising from [ex parte] communications." By doing so, the Commission purportedly ran afoul of the general proposition that "procedural due process requires that before being deprived of life, liberty, or property, a person or entity be given notice of the possible deprivation and an opportunity to defend." *Id.* ¶ 14. This argument is similarly unavailing. "[T]o claim the protections of the due process clause, an opponent must possess a cognizable property or liberty interest." *Citizens for Fair Rates & the Env't v. N.M. Pub. Regul. Comm'n*, 2022-NMSC-010, ¶ 34, 503 P.3d 1138. The Utilities make no attempt to identify such an interest, in the rulemaking or otherwise, that could trigger the due-process protections they claim. We therefore decline to consider this argument any further. *See, e.g.*, *Elane Photography v. Willock*, 2013-NMSC-040, ¶ 70, 309 P.3d 53 ("We will not review unclear arguments, or guess at what [a party's] arguments might be." (alteration in original) (internal quotation marks and citation omitted)).

**2. The Commission's reliance on the Team's recommendations did not violate the statutory prohibition against ex parte communications**

{52}    Turning to the Utilities' statutory argument, they rely on NMSA 1978, Section 62-19-23 (2004), which prohibits ex parte communications and, should such a communication occur, requires the Commission to "disclose it to all parties and give other parties an opportunity to respond." Section 62-19-23 (D). The Utilities assert

41

that the Commission refused to identify all members of the Team during the rulemaking and made it impossible to determine whether communications with the Team after the close of the record violated the prohibition. *See* § 62-19-23(A) (prohibiting ex parte communications "concerning a pending rulemaking after the record has been closed"); *see also* 1.2.3.7(B) NMAC (9/1/2008) (defining an *ex parte communication* in a Commission proceeding, in part, as a communication "concerning a pending rulemaking after the record has been closed"). In particular, the Utilities object to the Team's inclusion of "representatives of Staff of the Commission's Utilities Division," who, unlike advisory staff, are expressly prohibited from engaging in ex parte communications with the Commission. *Compare* NMSA 1978, § 62-19-17(E) (2003) ("Utility division staff shall not have ex parte communications with commissioners or a hearing examiner assigned to a utility case.") *with* § 62-19-23(C)(2) ("[A] commissioner may consult with another commissioner or with advisory staff whose function is to advise the [C]ommission in carrying out the commissioner's rulemaking or adjudicative responsibilities."). In considering the Utilities' argument, we note a considerable amount of uncertainty in the record about the Team's composition. We therefore provide additional background before we address the Utilities' argument in detail.

42

### a. Additional background

{53}    SPS and EPE first raised concerns about the Team after the Commission filed its Order Adopting the Rule.[9] In a request for procedural clarifications, SPS and EPE argued that the Team's "composition and role are unclear[, which] creates ambiguity as to the record in this matter[ and] ambiguity as to the rationale underlying the Order Adopting Rule." The utilities asserted that they had "been unable to locate any complete listing of the membership of the 'Team' in the record" and that the Commission's "partial descriptions" differed. The Initial Order described the Team as including two commissioners, plus "representatives of Staff of the Commission's Utilities Division, the Office of General Counsel, and the Chief of Staff, among others." The Notice of Proposed Rulemaking later described the Team as including two commissioners, "several employees of the Commission, and a Commission contractor." SPS and EPE also observed that, in the Commission's public deliberations during the rulemaking, "Mr. Arthur O'Donnell appeared to have the role of speaking for the 'Team' and providing its recommendations."

{54}    SPS and EPE urged that the Team's recommendations should be disclosed "for the benefit of participating stakeholders and the general public, regardless of

---

[9]PNM later raised substantially identical concerns in its motion for rehearing.

formal applicability of the Commission's ex parte rules." They also observed that, depending on the Team's composition, its substantive recommendations after the close of the record—its recommendations about the final rule in particular—may have amounted to undisclosed ex parte communications under the Commission's rules. *See* 1.2.3.1 to .11 NMAC (7/15/2004 as amended 9/1/2008) (regulating ex parte communications in Commission proceedings); *see also* § 62-19-23. SPS and EPE asked the Commission to clarify the Team's role and the scope of its authority in any remaining proceedings related to the Community Solar Rule, which were ongoing. SPS later moved for rehearing and requested reopening the record to supplement it with all of the Team's recommendations relied on by the Commission "in crafting the final rule" and providing an opportunity for public comment.

{55}    The Commission rejected these concerns and denied SPS's request to reopen the record. The Commission characterized the Utilities' "suddenly urgent concerns [about] the Team" as "disingenuous if not frivolous" and "baseless and untimely" given the Commission's transparency about the Team's participation and recommendations throughout the rulemaking. The Commission also clarified that Utility Division Staff "did not participate in Team discussions after the closing of the record" and that all Staff recommendations had been "entirely contained within Staff's filed comments." Notably however, the Commission did not identify

44

individual members of the Team and again described the Team as "Commissioners, expert consultants, and others." In a subsequent order, the Commission repeated its description of the Team as "Commissioners, expert consultants, and others" and specifically identified Arthur O'Donnell as a member. According to the Commission, Mr. O'Donnell's role was "that of advisory staff to the Commission, initially pursuant to a consulting contract and subsequently pursuant to an appointment in the U.S. Department of Energy's Office of Energy Efficiency & Renewable Energy (EERE) Research Participation Program."

**b.    Discussion**

{56}    Before we address the merits of the Utilities' argument, we make three preliminary points. First, other than questioning the nature of Mr. O'Donnell's role during the rulemaking, the Utilities have not argued to the Commission or on appeal that his participation was actually improper or that his advice after the close of the record required disclosure under Section 62-19-23(E) or the Commission's rules governing ex parte communications. *See* 1.2.3.10 NMAC (requiring disclosure of ex parte communications and an opportunity for all parties to respond). We therefore assume without deciding that the Commission's description of Mr. O'Donnell's role sufficiently identified him as "advisory staff whose function is to advise the [C]ommission in carrying out the commissioner's rulemaking . . . responsibilities."

45

Section 62-19-23(C)(2); *see also* § 62-19-19(A), (B)(4) (authorizing the Chief of Staff to hire advisory staff on a "temporary, term or contract basis" to *inter alia* "assist the [C]ommission in the development of rules"). As such, Mr. O'Donnell's communications with the Commission are exempt from the prohibition against ex parte communications and need not be disclosed. *See also Qwest Corp.*, 2006-NMSC-042, ¶ 60 (holding that the Commission "need not provide [the] parties with the substance of [the] advice" of an expert hired by the Commission as advisory staff); 1.2.3.9(C) NMAC ("Commissioners, hearing examiners and advisory staff may consult with each other.").

{57}    Second, in the course of our whole-record review, we have discovered an apparently full disclosure of the Team's membership that has not been cited on appeal or in any of the pleadings or Commission orders relevant to this issue. Shortly after the Team's creation, the Commission filed its first Order Scheduling Workshop and explicitly stated that "*all* members of the Team will participate." (Emphasis added.) In a footnote, the order identified "the members of the Team" by name and

job title.[10] Of note, the list of nine individual Team members is consistent with the Commission's repeated, varying descriptions of the Team, including Mr. O'Donnell as an "advisor to the Commission." Assuming the list is accurate, the Utilities' arguments on this issue are essentially moot when the only member of the Team subject to the prohibition against ex parte communications was the director of the Commission's Utility Division Staff, who according to the Commission, did not participate in Team discussions after the close of the record.

{58}    Accordingly, we hold that the Utilities have failed to meet their burden to show that the Order Adopting the Rule must be vacated and annulled. The Utilities rely on speculation and innuendo to argue that we should vacate and annul the order because, in essence, ex parte communications *may* have occurred. Focusing on the Team's inclusion of Utility Division Staff, the Utilities argue that "the Commission's after-the-fact representation regarding Utility Division Staff should not be deemed to cure the infirmity evident in the original order adopting the Rule." They

---

[10]The order identified the following members of the Team: Commissioners Joseph Maestas and Cynthia Hall, "Wayne Probst (the Commission's Chief of Staff), John Reynolds (Director of the Commission's Utility Division Staff), Arthur O'Donnell (advisor to the Commission), Jonas Armstrong (assistant to Comm. Maestas), Collin Gillespie (assistant to Comm. Hall), Russell Fisk (of the Commission's Office of General Counsel), Sarah Valencia (the Commission's Public Information Officer), and representatives of Strategen."

effectively invite us to disregard or disbelieve the Commission's on-record assurances that all input from Utility Division Staff was contained in their publicly filed comments and that no Utility Division Staff participated in Team discussions after the close of the record.

{59} The Utilities misunderstand their burden on appeal. "The burden shall be on the party appealing to show that the order appealed from is unreasonable, or unlawful." Section 62-11-4. We presume that "administrative action is correct and that the orders and decisions of the administrative body are valid and reasonable; presumptions will not be indulged against the regularity of the administrative agency's action." *State ex rel. Reynolds v. Aamodt*, 1990-NMSC-099, ¶ 9, 111 N.M. 4, 800 P.2d 1061 (internal quotation marks and citation omitted). The Utilities seek to flip the presumption of regularity on this issue without evidence or legal authority. We will not grant relief under these circumstances, when the Utilities have made no attempt to substantiate their accusations after the Commission addressed the Utilities' questions about the participation of Utility Division Staff after the close of

the record.[11] To hold otherwise would set too low a bar for undoing a Commission order under the ex parte statute.

{60}    We also agree with the Commission that its reliance on the Team was "more transparent than applicable law requires." Even assuming the Team included members subject to the prohibition against ex parte communications, the Commission routinely disclosed the Team's recommendations throughout the rulemaking, including before the prohibition applied. *See* § 62-19-23(A) (prohibiting ex parte communications "concerning a pending rulemaking *after* the record has been closed" (emphasis added)); 1.2.3.7(B) NMAC (defining *ex parte communication*). And assuming the Team consisted entirely of advisory staff after the close of the record, the Commission was under no duty to disclose its recommendations at all. *See* § 62-19-23(C)(2); *Qwest Corp.*, 2006-NMSC-042, ¶ 60; *see also* 1.2.3.9(C) NMAC ("Commissioners, hearing examiners and advisory staff may consult with each other."). The Commission's detailed disclosure of the Team's recommendations throughout the rulemaking process, including in the Order

---

[11]As noted by the Commission, "The Utilities did not seek from the Commission and do not include in the record before the Court any public records of the Commission to support their baseless claims." We agree that the Utilities' failure to undertake basic measures to investigate or substantiate their accusations undermines any argument for appellate relief. *See, e.g.*, NMSA 1978, § 14-2-8(A) (2009) (providing a right to inspect public records on request).

49

Adopting the Rule, provided ample explanation of the Commission's reasons for adopting the Rule, which we hold was sufficient under law. *See* NMSA 1978, § 62-19-21(E) (2001) (providing that all Commission rules "shall be filed in accordance with the State Rules Act [Chapter 14, Article 4 NMSA 1978]" (bracketed text in original)); *see also* NMSA 1978, § 14-4-5.5 (2017) (requiring "a concise explanatory statement" when an agency adopts a rule).

{61}    We are not persuaded that the Commission's reliance on the Team's recommendations after the close of the record deprived the Utilities of their statutory right to notice and an opportunity to respond to ex parte communications. The Utilities' claims that ex parte communications may have occurred are speculative, unsupported by evidence, and inconsistent with the record. We therefore affirm on this issue.

**C.    The Commission Did Not Violate the Public Utility Act or Due Process by Summarily Rejecting SPS's Proposed Bill-Credit Rate Without a Hearing**

{62}    For the final issue on appeal, SPS challenges the Commission's refusal to hold a hearing when it rejected SPS's initial proposed bill-credit rate, ordered SPS to file a rate that complied with Rule 573.20(D), and allowed SPS's revised bill-credit rate to take effect. SPS argues that the Commission's failure to hold a hearing violates the Public Utility Act and due process. We first provide additional background and

then address these arguments on their merits.

**1. Background**

{63} After the Rule was adopted, SPS filed Advice Notice 309, which included the bill-credit rate that SPS initially proposed for community solar subscribers. The advice notice openly revealed that SPS had subtracted transmission costs from the bill-credit rate, and it included written testimony that explained, among other things, why SPS had subtracted transmission costs notwithstanding the Rule's prohibition. According to SPS's two experts, transmission costs were subtracted "based on a concern that crediting the entirety of the transmission cost rate to [s]ubscribers would result in subsidization of such costs by nonsubscribers, in light of the fact that [s]ubscribers will necessarily continue to use SPS's transmission system for the delivery of their energy." The experts explained that during periods when solar energy is not being generated, including at night, subscribers will use electricity delivered through the transmission system, which serves a similar function as the distribution system.

{64} Four advocacy groups filed written protests, urging the Commission to summarily reject SPS's proposed bill-credit rate as "unlawful on its face" and "in complete disregard for the Commission's orders and the [Act]." Commission Staff similarly recommended suspending the advice notice because SPS had subtracted

51

transmission costs from the proposed bill-credit rate in violation of Rule 573.20(D).

{65}    SPS argued in response that it had a right to continue to raise the issue of transmission costs until it was resolved in this appeal. SPS also argued that it was making a good-faith effort to resolve the Rule with the Commission's order clarifying implementation of the Rule. The Commission rejected SPS's proposed bill-credit rate, finding that it was submitted "in flagrant disregard" of Rule 573.20(D). The Commission also ordered SPS to file a compliant bill-credit rate and specifically held that no hearing was necessary.

{66}    SPS then filed a motion to vacate or stay the order, as well as a conditionally filed advice notice under protest (Advice Notice 311). SPS argued that the previous order should be vacated because it compelled SPS to file a different bill-credit rate without first conducting a hearing. SPS further explained that it was "vigorously contesting inclusion of transmission costs in the bill credit—an as-applied challenge to the Commission's implementation of 17.9.573.20.D NMAC—on the basis that it is an improper subsidy in violation of the CSA." SPS further argued that rejecting the first advice notice without a hearing and ordering resubmission of a compliant advice notice violated due process.

{67}    The Commission denied SPS's motion to vacate or stay the order and allowed the bill-credit rate proposed in the Advice Notice 311 to take effect, again without a

hearing. The Commission reiterated that the first advice notice was submitted in "flagrant violation" of the Rule, which the Commission could determine without a hearing because "SPS expressly disputed the rule itself, and there was no dispute about application of the rule to SPS's specific facts and circumstances."

**2.      Discussion**

{68}    SPS argues that the Commission's failure to hold a hearing on either advice notice renders the ensuing orders void. SPS first argues that under the Public Utility Act, the Commission must hold a hearing before it can order "a rate different than [the rate] proposed by the utility itself." SPS relies on NMSA 1978, Section 62-8-7(D) (2011), which provides as follows:

> If *after a hearing* the [C]ommission finds the proposed rates to be unjust, unreasonable or in any way in violation of law, the [C]ommission shall determine the just and reasonable rates to be charged or applied by the utility for the service in question and shall fix the rates by order to be served upon the utility[,] or the [C]ommission by its order shall direct the utility to file new rates respecting such service that are designed to produce annual revenues no greater than those determined by the [C]ommission in its order to be just and reasonable.

(Emphasis added.) SPS argues that, without a hearing on either advice notice, the Commission lacked authority under Section 62-8-7(D) to reject the original proposed bill-credit rate, order the filing of a revised rate, and approve the revised rate that was filed under protest. Relatedly, SPS argues that the failure to hold a

hearing violated due process by preventing SPS from "develop[ing] a record on contested issues" concerning its proposed bill-credit rate. *See Resolute Wind 1 LLC v. N.M. Pub. Regul. Comm'n*, 2022-NMSC-011, ¶ 24, 506 P.3d 346 (holding that the Commission violated due process by using a "summary [disposition] procedure" that "precluded [the appellant] from presenting evidence and developing a record on the disputed . . . issue").

{69}     Under the specific circumstances of this case, we disagree that a hearing was required under Section 62-8-7(D) or as a matter of due process. *See, e.g.*, *TW Telecom*, 2011-NMSC-029, ¶ 17 ("Due process is not a concrete concept, but rather is flexible in nature and may adhere to such requisite procedural protections as the particular situation demands.") (internal quotation marks and citation omitted)). Neither the statute nor due process requires a hearing when, as here, the proposed bill-credit rate was submitted in open defiance of prescribed requirements. *See, e.g.*, 1 Kristin E. Hickman & Richard J. Pierce, Jr., *Administrative Law Treatise*, § 6.3, at 847 (7th ed. 2024) ("An oral evidentiary hearing is never required if the only disputes involve issues of law or policy.").

{70}     Moreover, the Commission was well-positioned to determine whether SPS was merely attempting to relitigate arguments of law or policy previously raised and considered during the rulemaking or genuinely attempting to develop a record on

54

disputed issues of fact. By the time the Commission considered Advice Notice 309, SPS's position on the issue of transmission costs was well known. The Commission had repeatedly considered and addressed SPS's arguments throughout the rulemaking, including in (1) the Notice of Proposed Rulemaking, which called out the Utilities' arguments during the informal proceedings and specifically solicited comment on whether transmission costs should be included or excluded from the bill-credit rate, (2) the Order Adopting the Rule, which summarized and addressed SPS's initial, response, and reply comments on the proposed rule, (3) the Order on Rehearing which denied SPS's arguments in its motion for rehearing, and (4) the order denying SPS's Motion to Stay Implementation of the Rule pending appeal. The Commission had also responded to the same arguments in this Court after SPS filed its Motion to Stay Implementation of [the Commission's] Orders Pending Appeal.

{71}     Suffice it to say, SPS's position on the issue of transmission costs was well-understood by the Commission when it rejected the proposed bill-credit rate in Advice Notice 309 without a hearing. The same is true of SPS's arguments when it filed Advice Notice 311 under protest. Indeed, SPS candidly admitted in support of Advice Notice 309 that it was making the very same arguments it had been making throughout the rulemaking: "As SPS has repeatedly noted in its filings in the

55

Community Solar rulemaking and in its pending appeal of the Commission's rulemaking order, [Rule 573.20(D)] must be interpreted and applied as SPS has proposed in its Advice Notice in order to comply with the plain language of the Community Solar Act." This admission made clear that SPS was merely attempting to accomplish through expert testimony what it had failed to achieve during the rulemaking: to persuade the Commission to adopt SPS's preferred reading of the statute. "When the regulated party's own admissions make clear that no material facts are in dispute, it is unnecessary to require a judge to recite these facts as 'findings' after a hearing." *See Kourouma v. Fed. Energy Regul. Comm'n*, 723 F.3d 274, 278 (D.C. Cir. 2013). Under these circumstances, lacking any dispute of material facts, when the proposed bill-credit rate was openly submitted "in violation of law," § 62-8-7(D), the Commission was free to reject Advice Notice 309 without a hearing.

{72}     We are unpersuaded by the authorities cited by SPS in favor of reversal. None involves a circumstance in which the Commission or its predecessor concluded that a hearing was unnecessary based on a rate submitted by a public utility in open defiance of prescribed requirements. *See Tri-State Generation & Transmission Ass'n, Inc. v. N.M. Pub. Regul. Comm'n*, 2015-NMSC-013, ¶¶ 2, 34-35, 347 P.3d 274; *see also TW Telecom*, 2011-NMSC-029, ¶ 1; *see also State v. Mountain States*

*Tel. & Tel. Co.*, 1950-NMSC-055, ¶¶ 5, 26-27, 54 N.M. 315, 224 P.2d 155. We have already held that the Commission reasonably interpreted the Act to prohibit subtracting transmission costs from the bill-credit rate. While SPS was free to preserve this issue in its advice notices pending the outcome of this appeal, the Commission was under no obligation to hold a hearing on a question of policy that was fully debated and considered during the rulemaking and clearly answered by the Rule.

## III.   CONCLUSION

{73}   We hold the Utilities, in their various challenges, failed to meet their burden in demonstrating that the Rule is unreasonable or unlawful in light of the Act. Accordingly, we affirm the Commission's adoption of the Rule. The Utilities also failed to substantiate their claim that the Rule must be vacated and annulled because of possible ex parte communications after the close of the rulemaking record. Finally, we hold that the Commission did not violate statute or due process when it rejected SPS's proposed bill-credit rate without a hearing.

{74}   **IT IS SO ORDERED.**

_____
**BRIANA H. ZAMORA, Justice**

57

**WE CONCUR:**

_____

**DAVID K. THOMSON, Chief Justice**

_____

**MICHAEL E. VIGIL, Justice**

_____

**C. SHANNON BACON, Justice**

_____

**JULIE J. VARGAS, Justice**